854 F.2d 238
 47 Empl. Prac. Dec. P 38,242, 48 Ed. Law Rep. 789,
3 Indiv.Empl.Rts.Cas. 1317
 William BERG, Plaintiff-Appellant,
v.
Dr. John HUNTER, individually and as President of the
College of Lake County, Illinois; James Doppke,
individually and as Vice President of Academic Affairs of
the College of Lake County, Illinois; Lawrence Matthews,
individually and as Associate Dean and Chairman of Health,
Physical Education, Recreation, Intramurals, and Athletics
of the College of Lake County, Illinois; Board of Trustees
of Illinois Community College District No. 532; and Eleanor
Rostron, Richard A. Anderson, Nancy Block, Millicent
Berliant, James Lumber, Richard Bryan, and Nan Fairhurst,
individually and jointly as Members of the Board of Trustees
of Illinois Community College District No. 532, Defendants-Appellees.
 No. 87-2050.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 24, 1988.
Decided Aug. 10, 1988.
Rehearing and Rehearing In Banc Denied Sept. 21, 1988.
 
 Lawrence Jay Walker, Cohen Starck & Weiner, Chicago, Ill., for plaintiff-appellant.
 Allen D. Schwartz, Robbins Schwartz Nicholas Lifton & Taylor, Ltd., Chicago, Ill., for defendants-appellees.
 Before BAUER, Chief Judge, MANION and KANNE, Circuit Judges.
 BAUER, Chief Judge.
 
 
 1
 William Berg appeals the district court's grant of summary judgment to the defendants on his First and Fourteenth Amendment claims. We affirm.
 
 I.
 
 2
 Berg served as the intramural athletic coordinator for the Community College of Lake County, Illinois (CLC) in its department of Health, Physical Education, Recreation, Intramurals, and Athletics (HPERIA), from January, 1978, until his dismissal in June, 1984. The defendants maintain that Berg's termination was incidental to a legitimate reorganization of HPERIA. Berg, the only casualty of the reorganization, charges that contrary to his First Amendment right to free speech, his termination was in retaliation for speaking out against the alleged misconduct of CLC's president, Dr. John Hunter. The district court declined to scrutinize the reasons behind Berg's dismissal, concluding that his accusations against Hunter were merely an extension of a personal grievance, not entitled to first amendment protection.[1]
 
 
 3
 Berg's tale begins with a clash involving Dr. Lawerence Matthews, CLC's Associate Dean and Chairman of HPERIA during Berg's employ. It seems that Berg and Matthews couldn't agree on which day of the week it was, much less deal with the complexities of scheduling intramural athletic events. Their squabbling culminated in a physical altercation on May 10, 1983, in which Berg alleged that Matthews assaulted him. Berg subsequently filed a "concern" against Matthews under CLC's formal grievance procedures.[2] Under these procedures, Dr. Hunter ultimately disposed of Berg's claim, finding that while there was no actual assault, "there was a regrettable loss of controlled response to Mr. Berg on Dr. Matthews' [sic] part." While Berg appealed Hunter's decision to CLC's Board of Regents, he filed a grievance against Hunter alleging fraud, management malpractice, public misrepresentation, and violations of CLC policy, the United States Constitution, and civil law.[3]
 
 
 4
 Although Berg acknowledges that many of his charges are grounded on Hunter's alleged mishandling of his personal dispute with Matthews,[4] he maintains that his accusations involve matters of public concern and, thus, are entitled to First Amendment protection. The district court viewed Berg's grievance against Hunter as nothing more than the "second round" of his personal squabble with Matthews in which Berg attacked the "judge" (Hunter) who scored the "first round" in Matthews's favor.[5]II.
 
 
 5
 Pickering v. Board of Regents, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its progeny, see Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), signaled a new era in First Amendment law, marked by greater appreciation for an employee's right to speak out on matters of public concern. Today, a balance must be struck between "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. at 1734. Where the employee's speech touches upon a matter of public concern and does not so substantially interfere with her work as to disrupt the efficient performance of the public service she renders, that speech cannot form the basis for an adverse employment decision. Id.
 
 A.
 
 6
 Recognition of an employee's free speech rights, however, does not subject every public employment decision to judicial scrutiny. See Callaway v. Hafeman, 832 F.2d 414, 416 (7th Cir.1987) ("The Constitution simply does not guarantee public employment unsullied by the potential for silly and at times unjustified termination or transfers unless premised upon specific forbidden grounds."). Nor do allegations involving free speech necessitate application of Pickering's balancing test where an employee "speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of private interest...." Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). Only where the asserted speech touches upon matters of political, social, or other concern to the community must the court employ a balancing test to determine whether the speech is constitutionally protected. Connick, 461 U.S. at 146, 1689; Pickering, 391 U.S. at 572, 88 S.Ct. at 1736.
 
 
 7
 Clearly, much of Berg's speech involves matters only of private concern, not requiring further scrutiny of the reasons for his discharge. As noted by the district court, Berg's ongoing personal dispute with Matthews cannot be divorced from his charges against Hunter. Although Berg makes much of the fact that he neither named Matthews in any of his three complaints alleging Hunter's management malpractice, nor admitted that dissatisfaction with the disposition of his grievance against Matthews motivated his charges against Hunter, we are obligated to consider the entire record in evaluating his speech. See Connick, 461 U.S. at 147-148, 103 S.Ct. at 1690-1691. That record belies Berg's contention that the two are unrelated.
 
 
 8
 It is no coincidence that Berg's grievance against Hunter followed closely behind an appeal of Hunter's disposition of the Matthews altercation. Berg himself acknowledges that the underlying facts and rationale for his grievance against Matthews form the basis for several of his charges against Hunter. The content of those charges substantiates the interdependence of the two. Many of the allegations relate directly to Hunter's handling of Berg's numerous personal grievances with Matthews. For example, Berg's charge that Hunter violated CLC Policy 933 against sexual harassment stems from Berg's complaint that Matthews's sexual harassment of others prevented Berg from doing his job. His claim that Hunter violated Policy 912, "Non-Scheduled Use of College Facilities, Equipment and Materials by Employees," is based on an allegation that Hunter ignored information about Matthews's failure to investigate the misappropriation of school equipment by faculty members as identified by Berg. And Berg's charge based on CLC Policy 204, "Specific Duties and Responsibilities," arises from Berg's complaint that Matthews failed to supply him with a charter of responsibilities setting out his duties.
 
 
 9
 Although matters of sexual harassment, the misappropriation of college property, and the allocation of specific duties within the college may relate to CLC's efficient performance, Berg's charges clearly sought vindication of his many disagreements with Matthews and his personal dissatisfaction with Hunter's performance as the President of CLC. His speech does not implicate broader issues of public school administration unrelated to his personal disputes. See Altman v. Hurst, 734 F.2d 1240, 1244 (7th Cir.), cert. denied, 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984). The timing and content of these charges are tied inexorably to matters of only personal interest to Berg. See Connick, 461 U.S. at 148, 103 S.Ct. at 1690 (Commenting on several questions raised in Myers's questionnaire, the Court noted that "while discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of Myers's questions is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors."). That the effective operation of government and the services it renders are matters of public concern generally does not make each link in the chain of government operations constitutional fodder for disgruntled employees. If every facet of internal operations within a government agency were of public concern, and therefore any employee complaint or comment on such matters constitutionally protected, no escape from judicial oversight of every governmental activity down to the smallest minutia would be possible. Id. at 149, 103 S.Ct. at 1691. Personal grievances cloaked in the garb of institutional dress are not thereby made matters of public concern. See Vukadinovich v. Bartels, 853 F.2d 1387 (7th Cir.1988); Hesse v. Bd. of Educ., 848 F.2d 748 (7th Cir.1988); Egger v. Phillips, 710 F.2d 292, 318 (7th Cir.) (en banc), cert. denied, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983); Ferrara v. Mills, 781 F.2d 1508, 1515-16 (11th Cir.1986). Content, form, and context all must be considered in evaluating the true nature of the speech in question.
 
 B.
 
 10
 Notwithstanding these caveats and admonitions, however, Connick makes clear that even amid the strife of personal dispute, an employee's speech may touch upon matters of public concern necessitating the use of Pickering 's balancing test. See Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir.1988); see also Johnson v. Lincoln Univ. of Commonwealth, 776 F.2d 443, 451 (3d Cir.1985) ("[T]he mere fact that an employer's statement is an outgrowth of his personal dispute does not prevent some aspect of it from touching upon matters of public concern, as Connick itself makes clear."). Although Connick undoubtedly sought to limit the court's involvement in ubiquitous employment disputes by permitting summary dismissal of a plaintiff's First Amendment claim where only private concerns are implicated, it nevertheless illustrates the application of Pickering where only a fragment of the speech at issue touches upon a matter of public concern.
 
 
 11
 In Connick, the Court found that the content of a single question out of fourteen propounded in Myers's questionnaire required application of the Pickering test because it involved an issue of public interest--whether assistant district attorneys felt pressured to work in political campaigns. Thus, even though the Court found that Myers's speech was motivated by dissatisfaction with her own job transfer--hardly a matter of public concern--and all but one of her questions involved only matters of private interest, the substance of that single question required a balancing of the parties' relative interests under Pickering. See Johnson, 776 F.2d at 451; Rode, 845 F.2d at 1201-1204.
 
 
 12
 Although the point or motive behind an employee's speech is relevant in determining whether matters of public concern are implicated by that speech, motive alone is not dispositive. A fair reading of Connick simply will not support the use of such a litmus test. Despite the Court's explicit finding that Myers's questionnaire was motivated by a personal dispute, id. 461 U.S. at 148, 103 S.Ct. at 1690, the content of her speech was paramount to the Court's finding that a public issue was implicated. This court also has recognized that content is the greatest single factor in the Connick inquiry. Yoggerst v. Hedges, 739 F.2d 293, 216 (7th Cir.1984); cf. Givhan v. Western Line Consolidated Sch. Dist., 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979). Like Myers's questionnaire in Connick, Berg's accusations are entangled in an ongoing personal dispute with his supervisors. Like Myers's single question regarding political campaigning, the content of a single charge raised by Berg also touches upon issues of public concern.
 
 
 13
 Even though Berg never made a claim regarding his own salary, he specifically accused Hunter of publicly misrepresenting staff and teacher salary increases during a period of budget deficits while actually increasing salaries at an inflated rate in order to garner patronage support at the college. Unwarranted salary increases at a public college during a period of budgetary constraints, coupled with public misrepresentations regarding the size of those increases, clearly involves matters of public concern. In an age of ever dwindling public resources, mounting deficits, and demand for greater accountability by public officials, charges of inequitable allocation or misuse of public funds implicates matters of substantial public importance. See Knapp v. Whitaker, 757 F.2d 827, 840 (7th Cir.), cert. denied, 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985).
 
 III.
 
 14
 Because Judge Marshall concluded that Berg's speech did not involve issues of public concern, he did not apply the Pickering test. We believe, as a matter of law, that such an analysis nevertheless renders Berg's speech constitutionally unprotected. Essentially, Pickering asks whether the state's allegedly retaliatory action is justified in light of the competing interests of the employee as a citizen and the state as an employer. Id. 391 U.S. at 572, 88 S.Ct. at 1736; see also Hesse, 848 F.2d at 753. That question requires an examination of the nature of the employee's speech and its disruptive impact on the function and operation of the governmental service at issue. Where an employee's speech hinders, or threatens to hinder, Connick, 461 U.S. at 152, 103 S.Ct. at 1692, the efficiency of the office or agency for which she works, her termination will not offend the First Amendment. Id. at 151, 154, 103 S.Ct. at 1692, 1693; see also Arnett v. Kennedy, 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974) (Powell, J., concurring) (Government must have the power as an employer "to remove employees whose conduct hinders efficient operation and to do so with dispatch.").
 
 
 15
 The record makes clear that Berg's speech had a decidedly adverse impact on the efficient administration of public education at CLC. Berg did not express his concern over allegedly inflated salary increases on just a single occasion. Rather, he engaged in a series of antagonistic and threatening communications involving three separate CLC ombudsmen (one of whom Berg charged separately with misconduct while handling his claim against Hunter), Hunter himself, and every member of CLC's Board.
 
 
 16
 The time and energy expended by Berg in pursuit of his attack on Hunter is apparent from the volume[6] and detail[7] of his correspondence. Indeed, the toll of his efforts is reflected in an unusually poor performance report evaluating Berg's work during 1984. Moreover, Berg's speech was a clear assault on Hunter's authority, see Pickering, 391 U.S. at 570, 88 S.Ct. at 1735, with whom he had close and frequent contact. Id. at 569-70, 88 S.Ct. at 1735-36. Such conduct could serve only to undermine Hunter's ability to maintain discipline and harmony among CLC's workforce, id. which, according to Berg's charges, was riddled with overpaid cronies functioning in Hunter's patronage system. Like Myers's questionnaire in Connick, Berg's conduct can be described fairly as a "mini-insurrection."
 
 
 17
 The "increasing hostility and deteriorating relationship" between Berg and his supervisors further exacerbates the disruptive impact of his speech. Berg's contentious and embittered accusations demonstrate a heightened level of personal animus toward Hunter and the entire CLC administration that could only create an "atmosphere detrimental to workplace harmony and cooperation." Hesse, 848 F.2d at 753.
 
 
 18
 Finally, although the emergence of Berg's public speech from the rubble of continuous personal disputes was not sufficient alone to defeat his claim at the Connick stage, the context within which an employee's speech arises is a relevant factor in the Pickering balance. See Connick, 461 U.S. at 153, 103 S.Ct. at 1693. And one, in this case at least, that limits the First Amendment interest at issue. Id. at 154, 103 S.Ct. at 1693. Berg was not a detached watchdog of local government. He was an embattled employee who touched upon a single matter of broader public concern amid persistent personal disputes. Taken together, then, the relevant Pickering factors tip in favor of the government.[8]
 
 The judgment of the district court is
 
 19
 AFFIRMED.
 
 
 
 [1]
 The defendants maintain that Berg's termination was an incidental result of the reorganization and unrelated to his charges against Hunter. Because the district court found that Berg's speech was unprotected, it never reached the issue of causation. Before a plaintiff may recover she must show that the protected speech was a substantial or motivating factor in the adverse job action. Mt. Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); see also Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)
 
 
 [2]
 CLC has an internal grievance procedure called "Framework for Addressing of Concerns" (FAC), which allows an employee to seek resolution of college-related concerns. The FAC states, in pertinent part, that a concern is an "issue which is felt to adversely affect an individual or group of individuals" and that a grievance is a "perceived violation, misinterpretation, misapplication of written college procedure or policy or civil law." CLC maintains a trained pool of ombudsmen, anyone of whom may be chosen by a grievant, to assist in mediation, representing both sides equally. The FAC contains several steps to resolve disputes. The final two steps are Step VI, "Presidential Review," and Step VII, "Option to appeal through President to the Board of Trustees." The Board has the right to determine whether to review the decision
 
 
 [3]
 Berg's grievance set out ten CLC policy violations and three civil law violations, including charges concerning: salary increases; the CLC framework for addressing concerns; sexual harassment; use of college facilities and equipment; "contract employees"; CLC's affirmative action program; CLC's tuition and fee refund policy; job responsibilities of administrative and professional personnel; administrative staff evaluation; and tutoring
 
 
 [4]
 Matthews also is a defendant to this suit. Berg, however, contends that he was named only after discovery revealed his involvement in the HPERIA reorganization and not as a result of any of their personal confrontations
 
 
 [5]
 On October 31, 1983, Berg filed his formal grievance with the CLC Board accusing Dr. Hunter of "management malpractice" ranging from "financial defrauding of Lake County residents" to sexual harassment. On December 8, 1983, Berg met with ombudsmen Webster and Palmieri regarding his grievance against Hunter. Berg subsequently filed a grievance against Webster for his conduct while acting as Berg's ombudsman. On January 4, 1984, Berg filed a second grievance against Hunter reiterating his earlier charges. Following the exhaustion of his grievance procedures, Berg sent a letter to each member of the Board on January 18, 1984, again reiterating his charges against Hunter and demanding a review of Hunter's "management malpractice." The Board responded by requesting specific details of the charges against Hunter. Berg's reply provided details of only one of the charges. On February 29, 1984, Hunter informed Berg by letter that the Board found no substance to his charges and formally dismissed Berg's grievance
 On February 27, 1984, at a CLC Vice President's meeting including Dr. Hunter, a proposal was submitted to reorganize HPERIA. Although no decision was made regarding the reorganization proposal, a subsequent meeting of the same group produced an agreement to reorganize the department and thereby eliminate Berg's position subject to approval by CLC's Board. On March 21, 1984, Berg was informed of the impending reorganization and elimination of his position. The Board subsequently adopted the reorganization plan and eliminated Berg's position by separate vote. Berg was the only full-time professional employee affected by the reorganization. Although he applied for other positions within CLC, Berg's contract was not renewed and he was not offered another job.
 
 
 [6]
 On October 31, 1983, Berg first filed a written grievance concerning salary increases shortly after Hunter had disposed of Berg's claims against Matthews. On December 8, 1983, Berg met with CLC's ombudsmen Palmieri and Webster regarding Berg's charges against Hunter. Berg subsequently filed a complaint against ombudsmen Webster on December 21, 1983, alleging his misconduct while handling the challenge to Hunter. On January 4, 1984, Berg again filed a written grievance reiterating his earlier charge against Hunter, and selected a new ombudsman, John Lumber. After repeatedly demanding a meeting with Hunter, Berg sent a letter to each member of the Board again expressing his concern over the salary increases and demanding that the Board "formally review the management malpractice and fraudulent actions of its employee, John O. Hunter, with appropriate action; or choose to do nothing, and violate your responsibilities as an elected public official." Finally, in response to the Board's request for details supporting his accusation, Berg mailed a registered letter to each member of the Board stating that the Board had until 5 p.m., Monday, February 27, 1984, to contact Berg. Failure to do so, the letter continued, would signal the Board's complicity in Hunter's fraud and prompt Berg to contact government regulatory agencies and legislative representatives. The letter closes with Berg's taunt:
 You have your one-sided deposition from which to build Dr. Hunter's defense. Now try to explain to the public why the numbers don't match up!!
 
 
 [7]
 Accompanying his February 20, 1984 letter, sent by certified mail to each Board member, for example, Berg attached twelve pages of exhibits including a detailed comparison of CLC employee salaries and salary increases that he had collected and analyzed. Newspaper articles, minutes of CLC Board meetings, and internal CLC memoranda also were attached
 
 
 [8]
 We also affirm Judge Marshall's disposition of Berg's remaining claims, including his Fourteenth Amendment challenge. Berg's position as an untenured college administrator employed on a year-to-year contract does not entitle him to due process protection. See Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); Perry v. Sinderman, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Hadley v. County of DuPage, 715 F.2d 1238 (7th Cir.1983) (no property interest found where plaintiff had fourteen years of continuous and satisfactory performance even though individual board members assured plaintiff that he would retain his job), cert. denied, 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984)