**Anthony MARQUEZ, Plaintiff,**

**v.**

**Bernard TURNOCK, et al., Defendants.**

**No. 89–3185.**

United States District Court,
C.D. Illinois,
Springfield Division.

June 14, 1991.

Mary Lee Leahy, Springfield, Ill., for plaintiff.

Lance T. Jones, Gordon & Glickson, P.C., Springfield, Ill., for defendants.

## OPINION

RICHARD MILLS, District Judge:

The First Amendment and public employees.

Does the First Amendment mean that the state, as an employer, must sit idly by while a public employee, motivated by jeal-

ousy and a difference of professional opinion, acts to undermine his supervisor and his employer?

No!

Verdict is directed in favor of Defendants.

■ This court is aware, of course, that a verdict should be directed only if the evidence, when viewed in the light most favorable to the nonmovant, fails to provide a basis upon which a jury could reasonably find for the nonmovant. *Birdsell v. Board of Fire and Police Comm'rs*, 854 F.2d 204, 206 (7th Cir.1988) (*citing Van Houdnos v. Evans*, 807 F.2d 648, 650 (7th Cir.1986); *Benson v. Allphin*, 786 F.2d 268, 279 (7th Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986)).[1] All disputed issues of material fact, including questions of witness credibility, are to be resolved in favor of the nonmovant. *Birdsell*, 854 F.2d at 206 (citing *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1213 (7th Cir.1985)). Therefore, our summary of the facts purposefully stresses the evidence that would support a resolution of disputed issues in Plaintiff's favor.

### Facts

Tony Marquez graduated from high school in New Jersey and was trained in medical services while serving in the U.S. Air Force in Vietnam. He was hired by the Illinois Department of Public Health in 1971 and was involved in the establishment of trauma services centers.

Marquez rose quite rapidly for a man whose formal education stopped at high school, and by 1977 he occupied the position of Chief of Program Operations. In that capacity, he was responsible for ambulance service licensure and EMS system compliance.

The position of Division Chief was created in 1978, to which the Chief of Program Operations and others would report. Plaintiff applied for this position, but it was filled by Dr. Bernard Turnock, M.D. Marquez reported to Dr. Turnock for two years

---

1. The proposed amendment to Fed.R.Civ.P. 50(a)(1), which will become effective December 1, 1991 absent Congressional action, is to the same effect.

and no problems were apparent. Plaintiff testified that he considered Dr. Turnock to be well-qualified and Dr. Turnock testified that he considered Plaintiff to have been a good employee. Dr. Turnock left the Department in 1980 to accept another position. Plaintiff again applied for the position of Division Chief and, again, it went to someone else, then in 1985, Dr. Turnock returned as the Director of the Illinois Department of Public Health.

In 1986, the position of Division Chief was once more vacant and Plaintiff reapplied. This time the position went to Ms. Stein–Spencer, a registered nurse with a master's degree, who had served as a nurse coordinator for a hospital in northern Illinois.

Until the fall of 1989, the Division Chief reported to the Associate Director of Health Services, Mrs. Shirley Randolph, who had held the position of Associate Director since 1979. The position of Associate Director reported to the Director, the position then held by Dr. Turnock.

Marquez was disappointed that he did not get the position of Division Chief and handled his disappointment in less than a professional manner. He complained to others that Ms. Stein–Spencer was "not qualified." Not surprisingly, the relationship between Ms. Stein–Spencer and Plaintiff was difficult.

Plaintiff's February, 1987 performance appraisal stated Plaintiff "moderately accomplishes" his job duties. Plaintiff filed a grievance over the evaluation. During the grievance process, Plaintiff described his supervisor, Ms. Stein–Spencer, as biased, vindictive and malicious. Referring to his supervisor's criticism of his leadership, Marquez commented that it was "the proverbial pot and kettle." Similar accusations were made by Plaintiff at the second level of the grievance process. The grievance responses of Mrs. Randolph and the personnel division noted that Plaintiff's comments exhibited that Plaintiff had a poor attitude toward his supervisors.

During the following month, Marquez was suspended for a day without pay for failing to follow written directives from his supervisor. The written directive at issue required EMS Staff to get approval from Ms. Stein–Spencer to attend State EMS Advisory Counsel meetings, which normally occurred during work hours.

On March 5, 1987, Plaintiff called in sick with a toothache. At 11:00 a.m. that day, Plaintiff attended an Emergency Medical Services Counsel meeting in Springfield, though he had not obtained prior approval. When asked about his attendance at the meeting, Plaintiff stated that his toothache was better and he decided to return to work by attending the EMS Counsel meeting.

Plaintiff grieved the suspension and sent Dr. Turnock a memorandum, dated March 23, 1987, protesting the action and asking "How long will the Department of Public Health allow a vindictive supervisor to randomly violate the rights of an employee?" Plaintiff also suggested an investigation into this "increasingly intolerable situation."

Between June, 1986 and August, 1988, Plaintiff was involved in the investigation of a number of ambulance services. Also involved in these investigations were the Department's Regional EMS Coordinators and the Project Medical Directors. Under the Emergency Medical Services Systems Act, *Ill.Rev.Stat.*, ch. 111½ ¶ 5513(e), the Project Medical Director is a physician who continually monitors and supervises the EMS services at a local level.

The tension between Marquez and his supervisor, Ms. Stein–Spencer, spilled over into the handling of these investigations. Plaintiff found potential violations during his investigations of several ambulance services and recommended that those ambulance services be suspended. Ms. Stein–Spencer instructed Plaintiff to forward his findings to the local Project Medical Director. At a meeting held July 21, 1987, Plaintiff disagreed with advising the Project Medical Director of his findings on the basis that certain allegations implicated the EMS System as part of the problem. Mrs. Randolph and Mr. Brey, the Department of Public Health liaison to the Illinois State Police, agreed with Ms. Stein–Spenc-

er. Plaintiff admitted that he became argumentative.

The culmination of the clash between Plaintiff and his supervisor over how violations should be handled came in the course of an investigation into Arrow Ambulance Service in Champaign, Illinois. The first investigation into Arrow began in May, 1987 after Dr. Cleve Trimble, Trauma Services Director at Burnham Hospital, and Dr. Gary Roth, Project Medical Director for the local EMS System met with Ms. Stein–Spencer. The investigation was initially assigned to Bill Boswell, the Regional EMS Coordinator, but Plaintiff was allowed to join the investigation. After reviewing the records, Plaintiff alleged certain violations and recommended that Ed Piraino, lead paramedic and former owner of Arrow, be suspended and that the EMS System be cited. Ms. Stein–Spencer directed Plaintiff to forward his findings to the Project Medical Director.

Dr. Joseph Danna, who had replaced Dr. Roth as Project Medical Director, reviewed Plaintiff's findings and submitted a detailed corrective action plan. That plan was accepted by Ms. Stein–Spencer and Plaintiff. Dr. Danna placed Piraino on probation, rather than suspension.

In September and October of 1987, new allegations against Arrow surfaced. Dr. Danna looked into these allegations and suspended Ed Piraino. A second investigation was begun in late October. As before, the investigation was initially assigned to Bill Boswell, but Plaintiff was allowed to join the investigation. Plaintiff again alleged certain violations and recommended that Arrow be suspended and the EMS System further reviewed. Ms. Stein–Spencer directed Plaintiff to inform Dr. Danna of his findings. In response to those findings, Dr. Danna prepared a second corrective action plan in December, 1987 which Plaintiff conceded was a good plan. Arrow was not suspended.

Marquez described the atmosphere that existed in the Spring of 1988 in the Champaign/Urbana hospital community as very competitive and admitted that he knew there were "Hospital Wars" going on at that time. In Champaign/Urbana, both Carle Hospital and Burnham Hospital were attempting to become "Resource Hospitals" under their own EMS System, and to be designated as Level I Trauma Centers.[2]

In April, 1988, Dr. Cleve Trimble, the Trauma Services Director at Burnham Hospital, contacted Plaintiff at home about a new complaint against Arrow. Dr. Trimble also contacted Ms. Stein–Spencer about the new complaint. At that time, Arrow was owned by Carle Hospital and was listed as Carle Hospital's only Advanced Life Support provider under its EMS System plan.

As in the two earlier investigations, Ms. Stein–Spencer assigned Bill Boswell to handle the investigation. She also assigned Jim Goldasich, the Regional EMS Coordinator for the Peoria Region, to assist Mr. Boswell. The complaint was also forwarded to Dr. Danna for his review and investigation. Mr. Boswell was instructed not to discuss the matter with anyone except Staff Legal Counsel or Ms. Stein–Spencer. Two simultaneous, but separate, investigations into Arrow ensued.

On May 25, 1988, Plaintiff sent the following memorandum to his supervisor.

TO: Leslee Stein–Spencer

FROM: Tony Marquez

SUBJECT: Champaign EMS System/Arrow Ambulance Service

It has now been over a month since I spoke with you regarding my discussion of April 13, 1988 with Dr. Trimble. As you will recall, Dr. Trimble reported that two members of Arrow Ambulance Service had voluntarily confessed to have [sic] participated in an alleged falsification of documents during a Department of Public Health investigation in November 1987. You had previously indicated

---

**2.** Under the Act, a Level I Trauma Center is "a hospital which: (1) ... within designated capabilities provides optimal care to trauma patients; (2) participates in an approved EMS system; and (3) is duly designated pursuant to the provisions of this Act. Level I Trauma Centers shall provide all essential services, as determined by the Department by rule, in-house, 24 hours per day." *Ill.Rev.Stat.*, ch. 111½, ¶ 5504.25.

that "When Bill takes a statement, *we* will figure out our next course of action." Since I have subsequently not been permitted to participate in the investigation, I must assume that the referenced *we* was not intended to include me. This was confirmed on May 13, 1988 when I called Mr. Boswell to ascertain how the investigation was going and he indicated he could not speak to me about it.

I am somewhat perplexed why as Chief of Program Operations, specifically responsible for ambulance service licensure, EMS systems, and as principal investigator of the two previous investigations, you have chosen to exclude me from this and other investigations. The task of investigating ambulance services is clearly delineated within my job description. In fact, you had previously supported my efforts to develop guidelines to ensure some degree of uniformity in the manner in which our Division documents and investigates complaints. You have chosen to disregard this, my expertise and experience, and have randomly assigned an investigation of a potentially criminal nature to Mr. Boswell.

The only effort to apprise me of the investigation, a note, indicates that you informed Ms. Kabat and Ms. Burns because the complainants are an EMT–I and an EMT–A. This infers that the entire matter has been reduced to an individual certification issue. The deliberate falsification of documents by an ambulance service during a Department of Public Health investigation can hardly be considered a certification issue. This is particularly disconcerting in light of the repetitious nature of the violations that have now been reported and verified over the past year.

Once again, I must strongly recommend that suspension or revocation of the Arrow Ambulance Service license be initiated upon confirmation of the alleged violations. Had this been done, as I had recommended after the November investigation, quality emergency pre-hospital care could now be a reality in the Champaign–Urbana community. The Department's failure to exercise its legislatively mandated enforcement authority is largely responsible for the mockery that has been made of our EMS standards and rules.

I fully understand that you, as Division Chief, have the ultimate responsibility and authority to dictate the manner in which we enforce the EMS Act and attendant rules. I must however protest the inconsequential results of my November investigation and the increasing number of programmatic activities related to my duties, in which I have been denied information and participation. I am appalled that a member of our staff would be prohibited from discussing an investigation with the Section Chief responsible for ambulance services and EMS systems. On both previous investigations Mr. Boswell has asked for my assistance after his preliminary review. Why has he now been denied even my input in the latest of problems endemic to the Champaign–Urbana EMS System?

My conspicuous absence from this investigation and the gag order imposed on Mr. Boswell and other staff gives rise to distrust, inhibits cooperation of Department personnel, and compromises my integrity within the EMS community and among our staff. If this has perhaps been necessitated by some concern on your part relative to my involvement in this and other investigations; I would appreciate your written explanation of same.

cc: Shirley Randolph

While the memorandum indicates that a copy was sent to Mrs. Randolph, it fails to indicate that Plaintiff also sent a copy of this memorandum to Dr. Trimble.

In early June, 1988, Dr. Danna submitted his findings regarding Arrow to the Department of Public Health. In mid-June, 1988, the Department initiated an order of suspension. Arrow requested a due process hearing on the suspension action pursuant to the Department's rules.

On June 23, 1988, Marquez met with Timothy O'Brien, Chief Counsel for the Department. Plaintiff presented Mr. O'Brien

with documents regarding Plaintiff's investigation efforts and requested that Mr. O'Brien forward these to the Director of the Department, Dr. Turnock. Dr. Turnock reviewed the documents and found no basis for Plaintiff's concerns about Ms. Stein–Spencer's handling of the findings from those investigations. However, partially in response to Plaintiff's concerns, Dr. Turnock expanded an audit of the Ambulance Licensing Program, one of Plaintiff's responsibilities, to include the entire EMS Division.

On July 27, 1988, while the investigation and proceedings against Arrow were still pending, Marquez was contacted by a reporter who asked permission to use the May 25, 1988 memorandum that Plaintiff had given to Dr. Trimble. Plaintiff gave his permission for the reporter to use the memorandum and portions of it were quoted in an article titled "Group tries to delay Carle trauma ruling" that appeared in the July 28, 1988 issue of the Champaign News–Gazette.

Another article referencing the same memorandum appeared in the same newspaper on August 5, 1988. That article stated: "Champaign County Health Care Consumers had objected to Carle's trauma center application on grounds of an internal IDPH memo that questioned the department's oversight of Carle-owned Arrow Ambulance."

Dr. Turnock stated that the articles placed the Department in the inappropriate position of being drawn into the Champaign–Urbana "Hospital Wars," and improperly tied the Arrow licensure question to the issue of Trauma Center designations. Dr. Turnock also indicated that he was concerned about the articles' unfavorable depictions of the Department and Ms. Stein–Spencer, and with the articles' interference with the administrative proceedings against Arrow.

The Arrow Ambulance matter was finally settled in September, 1988.

In Spring, 1988, Ms. Stein–Spencer began seriously working on a reorganization of the EMS Division. Her plan included decentralizing the Division and increasing the responsibilities of the regional staff. Concomitantly, the plan involved reducing Plaintiff's responsibilities in investigating and monitoring ambulance and paramedic services. The reorganization was announced to the staff in April, 1988, and reiterated in a memorandum dated May 6, 1988.

In July, 1988, Plaintiff filed a grievance regarding the reduction of his duties, which he later withdrew.

On August 16, 1988, an article appeared in the Belleville News–Democrat regarding an investigation into Sawyer Brothers and Sons Ambulance Service. That article included the following references to statements by the Plaintiff:

Anthony Marquez of the Illinois Department of Public Health's emergency medical services said Monday allegations that Sawyer Brothers and Sons Ambulance Service denied allowing an ESA Inc. paramedic to examine a gunshot victim prompted the department's investigation.

The results of the investigation will determine whether a hearing will be held to revoke the emergency medical technician licenses from the two Sawyer employees, who transported Henderson, Marquez said.

Marquez said investigators will also examine whether the Sawyer technicians should have taken Henderson to Memorial Hospital, which was closest to the scene.

Marquez said Sawyer did not have to turn the critical patient over to a paramedic.

"Nothing in the law requires basic life ambulance services to turn a patient over to a paramedic," Marquez said. "Ethically, if a patient's condition warrants it, that should be done."

This article prompted a memorandum from Ms. Stein–Spencer to Plaintiff. That memorandum stated:

(1) that no one in the office knew that a complaint had been filed or that a formal investigation had begun;

(2) that someone in the office received a call from the paper on August 17; the person called knew nothing about the incident and had to call Plaintiff to find out what happened after learning that Plaintiff had talked to the paper on August 12;

(3) that Plaintiff's statements violated a departmental directive allowing only the Director of the Department, the Department's Director of Communications (DOC), and designated Public Information Officers (PIOs) to speak for the Department;

(4) that Plaintiff's statements also violated a provision that allows other employees to answer media requests for immediate information if "it is strictly a factual inquiry" and requiring the employee to inform the DOC or a PIO of the contact; and

(5) that Plaintiff's statements violated a part of the directive making certain information on internal workings confidential.

The conclusion of the memorandum instructed Marquez that: "From now on, you are to refrain from speaking to any news people on any EMS issue."

In August, 1988, Dr. Turnock transferred Marquez out of the EMS Division on a six-month special assignment on injury control issues. Plaintiff called Dr. Turnock at home on August 24, 1988 regarding the special assignment. Dr. Turnock told Plaintiff he was getting the assignment so that Ms. Stein–Spencer could do her job and because there was a departmental need he could fill. Marquez testified that Dr. Turnock asked him to "hang up while we're still friendly."

In September, 1988, Ms. Stein–Spencer and Mrs. Randolph completed their plan to reorganize the EMS Division. This plan included the elimination of the Chief of Program Operations position. In February, 1989, Plaintiff accepted a permanent position in injury control, his former position having been eliminated.

### Analysis

For a government employee to succeed on a First Amendment claim against his employer, he must show (1) that the speech was constitutionally protected under the circumstances, and (2) that the employer retaliated against the employee for that speech. *See Barkoo v. Melby*, 901 F.2d 613, 617 (7th Cir.1990). *See also, Knapp v. Whitaker*, 757 F.2d 827, 845 (7th Cir.1985), *cert. denied*, 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985).

As the Supreme Court stated in *Connick v. Myers*, where the expression is not on a matter of public concern, "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). The Supreme Court held in that case that "absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690.

In *Connick*, an employee, disgruntled about the fact she was to be transferred, designed a questionnaire and passed it out to fellow employees. The Court stated that "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690. The Court held that most of her speech related to her personal grievance and did not involve matters of public concern. Her actions reflected her "dissatisfaction ... and an attempt to turn that displeasure into a cause celebre." *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. Further, the Court noted that the Plaintiff was not seeking to inform the public that the office in which she worked was not discharging its governmental responsibilities or that her supervisor or others were involved in wrongdoing or breaching the public trust. *Connick*, 461 U.S. at 148, 103 S.Ct. at 1690. One question, however, having to do with pressure to work on political campaigns did, in a limited fashion, touch on a matter of public concern. That question was sufficient to bring into play the balancing test set forth

in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Given the unlimited circumstances where a public employee's statement on an issue of public concern could clash with the employer's interest in running its office, the Supreme Court declined "to attempt to lay down a general standard against which all such statements may be judged." *Pickering*, 391 U.S. at 569, 88 S.Ct. at 1735. Under *Pickering*, "the State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. 138, 150, 103 S.Ct. 1684, 1692.

In *Connick*, the Supreme Court, applying the balancing test, noted that the employee's speech touched on matters of public concern only in a "most limited sense" and that speech was "most accurately characterized as an employee grievance concerning internal office policy." The limited First Amendment interest involved did not require the employer to "tolerate action he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." *Connick*, 461 U.S. 138, 154, 103 S.Ct. 1684, 1694. Therefore the employee's discharge did not offend the First Amendment.

■■■ An employee does not relinquish his First Amendment rights when he goes to work for the government, but he implicitly agrees that his rights to speech can be balanced against the government's interest in running an efficient office. *See Breuer v. Hart*, 909 F.2d 1035 (7th Cir.1990). The threshold inquiry is whether the government employee's statements or actions involved an issue of public concern, so that Defendant's actions may be " 'subject to judicial review' under the First Amendment." *Breuer*, 909 F.2d 1035, 1037 (citing *Connick v. Myers*, 461 U.S. 138, 146–47, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983)). If so, then the employee's interest "as a citizen, in commenting upon matters of public concern" must be balanced against the State's interest, as an employer, in an efficient workplace. *Breuer*, 909 F.2d 1035, 1037 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731,

1734, 20 L.Ed.2d 811 (1968)). "Though these inquiries require predicate factual determinations, they are questions of law." *Breuer*, 909 F.2d 1035, 1037 (citations omitted).

The emphasis in *Pickering* on the public employee's right "as a citizen, in commenting upon matters of public concern" is significant. That emphasis reflects the historical development of the rights of public employees as well as "the common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. at 143, 103 S.Ct. at 1688.

The Seventh Circuit has refused to extend First Amendment protection where the speech's "subject matter related to the 'internal operations within a government agency' that [the Seventh Circuit suggested in *Berg v. Hunter*, 854 F.2d 238, 242 (7th Cir.1988) ] were not matters of public concern." *Barkoo v. Melby*, 901 F.2d 613, 620 (7th Cir.1990).

■■ Where the employee's speech hinders or threatens to hinder the efficiency of the operation or agency, the employee's termination does not offend the First Amendment. *Berg v. Hunter*, 854 F.2d 238 (7th Cir.1988) (citing *Connick v. Myers*, 461 U.S. 138, 152, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708 (1983)). The employer is not required to wait until working relationships disintegrate when immediate action might prevent such disintegration. *Breuer*, 909 F.2d 1035, 1040.

### Conclusion I

■■ In this case, Plaintiff had three major conflicts with his supervisor. *First*, they disagreed on whether noncompliance with regulations should result in a summary suspension or in probation combined with a plan for corrective actions. *Second*, they disagreed on whether investigations of ambulance services should be directed centrally, by the Chief of Program Operations, or locally, by the Regional EMS Coordinator and the Project Medical Director. *Third*—and most important—they disagreed on who should make the final decisions. Although Plaintiff claimed to recog-

nize that Ms. Stein–Spencer, as Division Chief, had "the ultimate responsibility and authority to dictate the manner in which [they enforced] the EMS Act and attendant rules," Plaintiff protested to Ms. Stein–Spencer, to Mrs. Randolph, to the legal department, to Dr. Turnock, and to the press, when his recommendations as to how the Act and rules should be enforced were not followed.

An application of the controlling legal principles makes it clear that a directed verdict must be entered in favor of the Defendants in this case.

As stated in *Pickering* and emphasized in *Connick*, the First Amendment protects the right of a public employee *as a citizen*, not as an employee, to speak on matters of public concern. Marquez's most disruptive act of "speech" involved the memorandum he wrote to his supervisor, Division Chief Leslee Stein–Spencer, with a copy to her supervisor, Associate Director Mrs. Randolph. This memorandum was clearly written as an employee of the Department of Public Health—not as a citizen. Plaintiff's surreptitious supplying of a copy of this memorandum to Dr. Trimble and his granting of permission to a newsperson to use the memo does not change the fact that he wrote it as an employee.

█ Plaintiff's statements to the Belleville News–Democrat that appeared in the August 16, 1988 edition were also made as an employee, rather than as a citizen. Indeed, the paper identifies him as "Anthony Marquez of the Illinois Department of Public Health's emergency medical services." And when Plaintiff attended a meeting he had been directed not to attend without his supervisor's permission, after calling in sick that morning, he later claimed that he had felt better and decided to return to work by attending the meeting. Therefore, based on Plaintiff's own characterization, it must be concluded that he attended the meeting as an employee, rather than as a citizen.

█ Even if Plaintiff had spoken as a citizen, rather than as an employee, most of his speech would not have been protected. This case is somewhat similar to *Con-*

*nick.* As in *Connick*, Plaintiff was not seeking to inform the public of some wrongdoing or a breach of the public trust. Most of Plaintiff's speech was motivated by personal dissatisfaction and his desire to turn his dissatisfaction into a cause celebre. Plaintiff's dissatisfaction stemmed from the fact that his investigative responsibilities were being lessened and that his recommendations weren't followed. And Plaintiff's frustrations that the Division wasn't run his way was consistent with his attitude that he was better qualified to be Division Chief than Ms. Stein–Spencer. *Connick* stated that whether speech addresses a matter of public concern is based on "the content, form, and context of a given statement as revealed by the record as a whole." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690. The content of most of Plaintiff's speech involved internal office decisions. The form and context of Plaintiff's protests evidenced tactlessness, poor judgment, insubordination and deceitfulness.

### Conclusion II

█ To the extent that Plaintiff's speech touched, albeit tangentially, on the quality of emergency medical health care, that is an area of public concern. If Plaintiff's speech had been as a citizen, rather than as an employee, that would require application of the *Pickering* balancing test. That test involves balancing the employee's interest "as a citizen, in commenting upon matters of public concern" against the State's interest, as an employer, in an efficient workplace. *Breuer*, 909 F.2d 1035, 1037 (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)).

In this case, Plaintiff's speech touched on a matter of public concern only in a "most limited sense." And here, Plaintiff's actions did not merely threaten to disrupt the efficiency of the office—Plaintiff's actions created an "intolerable situation." The disruption of the office was so extreme that one reason the Director stated for Plaintiff's transfer was to allow his supervisor to do her job. Plaintiff's accusations of his

supervisor describe his own actions—biased, vindictive and malicious.

So even if Marquez had spoken as a citizen, his limited First Amendment interest would not have required the Department of Public Health to tolerate the disruption of the office, the undermining of the authority of his superiors, and the destruction of working relationships that Marquez inflicted on the department.

*Ergo,* Defendants' motion for a directed verdict is ALLOWED.

Case CLOSED.