185 F.3d 840 (7th Cir. 1999)
 PETER A. KOKKINIS, Plaintiff-Appellant,
v.
VLADIMIR IVKOVICH, individually and officially as Chief of Police of the Bridgeview Police Department, and VILLAGE OF BRIDGEVIEW, a body politic and corporate, Defendants-Appellees.
 No. 98-3047
 United States Court of Appeals, Seventh Circuit
 Argued January 19, 1999
Decided July 26, 1999
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 97 C 1348--James H. Alesia, Judge.
 Before FLAUM, RIPPLE and DIANE P. WOOD, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 Peter Kokkinis brought this sec. 1983 action against Police Chief Vladimir Ivkovich and the Village of Bridgeview. He alleged that the defendants retaliated against him for exercising his First Amendment rights after he made statements about the Police Chief on television. The district court granted the defendants' motion for summary judgment on the ground that Mr. Kokkinis' statements were not constitutionally protected because they did not address a matter of public concern. For the reasons set forth in the following opinion, we affirm the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 Peter Kokkinis became a patrol officer for the Bridgeview Police Department in 1987. During his employment, he developed a negative view of Police Chief Vladimir Ivkovich ("the Chief"). Mr. Kokkinis kept a diary that documented his problems with the Chief. This diary contains references to "the Chief's pimp games," the Chief's "cold" style in firing someone on Valentine's Day, the Chief's lying about never having received two grievances filed by Mr. Kokkinis,[1] the Chief's lying about why Mr. Kokkinis was not promoted to detective, and the Chief's violation of rules and regulations by taking no police action when a fight occurred during a Board meeting. These diary entries are dated in the months prior to May 1995.
 
 
 4
 On May 17, 1995, Mr. Kokkinis appeared on a Channel Five News at 5:00 report covering Officer Sharon Walsh's allegation of sex discrimination within the police department. The reporter introduced him by saying, "[A]nother officer, who did not want to be identified, feels Officer Walsh is unfairly being chosen for the assignment, and says the residents of Bridgeview should know the situation inside the police department." Mr. Kokkinis then appeared behind a screen, wearing a ski mask. With his voice electronically modified, he said, "If they really knew what was going on, I think they would be in utter shock." The reporter asked, "Why?" Mr. Kokkinis replied, "Because they are clueless as to what is going on. Everybody is so afraid of the Chief's vindictiveness. If you even dare to question any decision he makes, basically your life will be made miserable."
 
 
 5
 Mr. Kokkinis had agreed to be interviewed after the reporter contacted him and said she would be reporting on sex discrimination within the police department. He claims that he agreed to talk with the reporter because he felt that Walsh was being discriminated against because she is a woman. He wanted to help her cause and to encourage more officers to speak out. However, he admits that he did not know why Walsh apparently had been treated differently from other officers when the Chief ordered her to take an assignment that other officers had been allowed to decline.
 
 
 6
 The television broadcast bothered the Chief because he thought Mr. Kokkinis' comments were untrue and reflected negatively on the department. The Chief viewed the broadcast as an embarrassment to himself and to the department as a whole, especially after he received phone calls about the broadcast, including one from the former chief. The Chief worried that the broadcast would adversely affect morale among the officers by undermining his efforts to build the department's esteem. Other ranking officers thought that both the content and manner of Mr. Kokkinis' statements made a mockery of the department. The television appearance, in their view, cast a negative light on the members of the department and was a discredit to the department as a whole.
 
 
 7
 After an investigation, Mr. Kokkinis admitted that he was the masked speaker. The Chief suspended Mr. Kokkinis for 5 days for violating department rules and regulations by appearing on television without first notifying the Chief. The Board of Fire and Police Commissioners reversed the suspension on September 5, 1995.
 
 
 8
 During this period, a sequence of events prompted the Chief to take other action. Mr. Kokkinis accidentally shot himself; fellow officers discovered that Mr. Kokkinis was "keeping book" on them; problems developed between Mr. Kokkinis and his supervisors; and Mr. Kokkinis began taking prescription medication due to stress. The Chief therefore ordered Mr. Kokkinis to undergo psychological evaluation. The evaluation concluded that Mr. Kokkinis' problems with authority rendered him unfit for work within a quasi-military organization like a police department. The Chief responded by placing Mr. Kokkinis on administrative duty in the station and denied Mr. Kokkinis' request for secondary employment as a bank security guard because it involved carrying a firearm.
 
 B. Decision of the District Court
 
 9
 The district court's analysis focused on the issue whether Mr. Kokkinis' speech involved a matter of public concern. Applying the test set out in Connick v. Myers, 461 U.S. 138, 147-48 (1983), the district court evaluated "the content, form, and context of the statement, as revealed by the record as a whole." The district court also noted that the plaintiff's motive in speaking is a relevant, although not dispositive, consideration.
 
 
 10
 In the district court's view, Mr. Kokkinis' statements concerned a matter of only personal, not public, concern. The "entire content" of Mr. Kokkinis' statements consisted only of his personal view that the Chief is vindictive and did not even mention Walsh or her charge of sex discrimination. Moreover, the district court held, the overall context in which Mr. Kokkinis made his statements was one of Mr. Kokkinis' personal unhappiness with the Chief, as revealed by Mr. Kokkinis' diary entries. In the district court's view, the fact that the statements were made in the context of a news program about Walsh's sex discrimination allegation did not transform the speech into a matter of public concern.
 
 
 11
 Additionally, the district court held that the form of the statements--an interview on a public news program--did not mean the statements necessarily involved a matter of public concern. Finally, the district court found that Mr. Kokkinis' motivation in making the statements was to further his own personal interest in expressing unhappiness with the Chief, not to bring to light sex discrimination or to advance Walsh's charge of sex discrimination.
 
 
 12
 On the ground that Mr. Kokkinis' statements did not address a matter of public concern, the district court granted summary judgment to the defendants on Mr. Kokkinis' sec. 1983 First Amendment retaliation claim.
 
 II
 DISCUSSION
 
 13
 A claim under sec. 1983 for retaliation in violation of the First Amendment requires a three-step analysis. First, the court must determine whether the plaintiff's speech was constitutionally protected. If so, then the plaintiff must prove that the defendant's actions were motivated by the plaintiff's constitutionally protected speech. Finally, if the plaintiff can demonstrate that his constitutionally protected speech was a substantial or motivating factor in the defendant's actions, the defendant is given the opportunity to demonstrate that it would have taken the same action in the absence of the plaintiff's exercise of his rights under the First Amendment. See Belk v. Town of Minocqua, 858 F.2d 1258, 1262 & n.6 (7th Cir. 1988); Vukadinovich v. Bartels, 853 F.2d 1387, 1389-90 (7th Cir. 1988).
 
 
 14
 The first step of this analysis--determining whether the plaintiff's speech was constitutionally protected--is a question of law for the court, see Connick v. Myers, 461 U.S. 138, 148 n.7 (1983); see also Berg v. Hunter, 854 F.2d 238, 243 (7th Cir. 1988), cert. denied, 489 U.S. 1053 (1989); Hesse v. Board of Educ. of Township High Sch. Dist. No. 211, 848 F.2d 748, 753 (7th Cir. 1988), cert. denied, 489 U.S. 1015 (1989), which requires application of the two- part Connick-Pickering test. First, the court must determine whether the plaintiff's speech addressed a matter of public concern. See Connick, 461 U.S. at 147-48. If this hurdle is cleared, the court must then apply the Pickering balancing test to determine whether "the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern" outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Educ. of Township High Sch. Dist. 205, 391 U.S. 563, 568 (1968).
 
 
 15
 The district court rested its decision on the first prong of the Connick-Pickering test; it concluded that Mr. Kokkinis' speech did not address a matter of public concern. The issue of sex discrimination in public employment is, of course, a matter of public concern. See Hartman v. Board of Trustees of Community College Dist. No. 508, 4 F.3d 465, 472 n.5 (7th Cir. 1993); Marshall v. Allen, 984 F.2d 787, 795 (7th Cir. 1993). Our precedent makes clear, however, that speaking up on a topic that may be deemed one of public importance does not automatically mean the employee's statements address a matter of public concern as that term is employed in Connick. See Cliff v. Board of Sch. Comm'rs of City of Indianapolis, 42 F.3d 403, 410 (7th Cir. 1994). Rather, we "must instead delve deeper into the precise content, form, and context of speech that admittedly may be of some interest to the public." Id. As the district court recognized, it is necessary to "look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" Callaway v. Hafeman, 832 F.2d 414, 417 (7th Cir. 1987) (quoting Linhart v. Glatfelter, 771 F.2d 1004, 1010 (7th Cir. 1985)) (internal quotation marks omitted).
 
 
 16
 As the district court noted, application of these criteria to the record before us presents a strong case that the point of the plaintiff's speech was simply to further his own goal of expressing his displeasure with the Chief's policies. The plaintiff's statements during the broadcast portion of the interview were not at all related to Walsh's charge of sex discrimination.[2] They simply expressed the plaintiff's personal opinion as to the Chief's vindictiveness. Nor did the fact that the statements were made in the course of a news program covering sex discrimination, standing alone, give the plaintiff the right to say anything that he wanted to about the Chief. Even when the statements are viewed in the broader context of the entire interview, see Rankin v. McPherson, 483 U.S. 378, 386-87 (1987), the circumstances here support the district court's determination that Mr. Kokkinis' participation in the interview was not designed to address a matter of public concern. The record discloses that Mr. Kokkinis had a limited interest in speaking on the subject of sex discrimination within the police department. Mr. Kokkinis' own deposition testimony reveals that the basis for his knowledge of the alleged sex discrimination was minimal at best. Indeed, the basis for his opinion that Officer Walsh's assignment was motivated by sex discrimination was his recollection that a finding of sex discrimination had been sustained against the Chief in an unrelated case in 1992, along with one officer's testimony that he was given a choice to take or decline the assignment that Officer Walsh was required to take. Ultimately, Mr. Kokkinis admitted that he did not know why the Chief had ordered Officer Walsh to take the assignment. Although Mr. Kokkinis testified that he believed Officer Walsh was subjected to discriminatory treatment when she was required to undergo psychological examinations after her maternity leave, he admitted that this judgment on his part was based solely on his lay opinion that she exhibited no symptoms justifying such an examination. Indeed, he admitted that there may have been a legitimate basis for the examinations of which he was simply unaware.
 
 
 17
 Even if we were to decide that Mr. Kokkinis' speech addressed a matter of public concern under Connick, it is clear that Mr. Kokkinis' claim cannot survive the Pickering analysis.
 
 
 18
 In Caruso v. DeLuca, 81 F.3d 666 (7th Cir. 1996), we noted several factors that should be considered when balancing the employee's First Amendment interests against the government's interest in providing services efficiently:
 
 
 19
 (1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.
 
 
 20
 Id. at 371 (quoting Wright v. Illinois Dept. of Children & Family Servs., 40 F.3d 1492, 1502 (7th Cir. 1994)) (internal quotation marks omitted). With respect to the first two factors, we note that a government employer is allowed to consider "the potential disruptiveness" of the employee's speech. Caruso, 81 F.3d at 670-71 (quoting Waters v. Churchill, 511 U.S. 661, 680 (1994) (plurality opinion)) (internal quotation marks omitted). "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." Connick, 461 U.S. at 151-52. Indeed, "[t]he public employer is not required to wait until those working relationships actually disintegrate if immediate action might prevent such disintegration." Breuer v. Hart, 909 F.2d 1035, 1040 (7th Cir. 1990).
 
 
 21
 Deference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement. "[T]here is a particularly urgent need for close teamwork among those involved in the 'high stakes' field of law enforcement. Speech that might not interfere with work in an environment less dependent on order, discipline, and esprit de corps could be debilitating to a police force. Such considerations are permissible in weighing constitutional violations." Id. at 1041 (citations omitted); see also Jefferson v. Ambroz, 90 F.3d 1291, 1297 (7th Cir. 1996). In this respect, we find instructive the Eighth Circuit's recognition, in Tyler v. City of Mountain Home, 72 F.3d 568, 570 (8th Cir. 1995), of the special need for deference to the employment decisions of those responsible for ensuring public safety:
 
 
 22
 It has been recognized that a police department has a more significant interest than the typical government employer in regulating the speech activities of its employees in order "to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence." [Shands v. City of Kennett, 993 F.2d 1337, 1344 (8th Cir. 1993), cert. denied, 510 U.S. 1072 (1994)] (citations omitted). "Because police departments function as paramilitary organizations charged with maintaining public safety and order, they are given more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer." Tindle v. Caudell, 56 F.3d 966, 971 (8th Cir. 1995). The public safety employer's determinations of both the potential for disruption as a result of the speech, as well as the employer's response to the actual or perceived disruption, are entitled to "considerable judicial deference." Shands, 993 F.2d at 1345.
 
 
 23
 Tyler, 72 F.3d at 570.
 
 
 24
 We cannot accept Mr. Kokkinis' submission that reliance on the "potential" disruption of the police department as justification for the alleged adverse employment actions is insufficient to tip the Pickering balance in the defendants' favor. The speech at issue adversely affected harmony and loyalty among co-workers. Evidence in the record indicates that Mr. Kokkinis' TV appearance, and particularly the manner of his appearance, damaged his superiors' and fellow officers' confidence in him and at least potentially endangered their working relationships. The record also reflects that Mr. Kokkinis' statements caused embarrassment to his superiors and co-workers and that his relationships with them deteriorated after the broadcast. They believed that his appearance cast a negative light on the department and made the department look like a "bunch of clowns" in the eyes of the surrounding communities. R.23 at 12. Many officers were embarrassed especially by Mr. Kokkinis' chosen manner of expressing his views and believed that he had sensationalized the matter and had spoken untruths. In sum, Mr. Kokkinis' superiors and co-workers thought that his television appearance was inappropriate and damaged the department's collective efforts to portray professionalism.
 
 
 25
 It was not unreasonable for the Chief to believe that Mr. Kokkinis' statements undermined the Chief's ability to maintain authority and discipline within the police department. Mr. Kokkinis' criticism of the Chief on television served to air the hostility that existed between Mr. Kokkinis and the Chief; it constituted a challenge to the Chief's authority and management style. In Khuans v. School Dist. 110, 123 F.3d 1010 (7th Cir. 1997), this court acknowledged that an employee's statements questioning her supervisor in the presence of their superior and other co-workers "created a potential problem in maintaining authority and discipline within the department." Id. at 1017. Under the circumstances in this case, the Chief was entitled to take action to remedy the disruption--both actual and potential--and the threat to departmental discipline and order caused by Mr. Kokkinis' speech. See id. at 1018.
 
 
 26
 Caruso counsels that we must also consider the context in which Mr. Kokkinis' grievances arose. In Hesse v. Board of Education of Township High School District No. 211, 848 F.2d 748 (7th Cir. 1988), the court took into account "the increasing hostility and deteriorating employment relationship which had been developing between the plaintiff and his superiors" in the years preceding the adverse job action. Id. at 753; see also id. at 753 n.4. In this case, Mr. Kokkinis' diary entries chronicle his serial and ongoing conflicts with the Chief in the months prior to the television appearance. The increasing distrust and hostility between Mr. Kokkinis and the Chief must inform our evaluation of the Chief's response to Mr. Kokkinis' speech. We cannot say that the Chief responded unreasonably in viewing Mr. Kokkinis' statements as an escalation of the conflict between them that required remedial action.
 
 
 27
 In sum, the record amply supports the position that Mr. Kokkinis' decision to criticize the Chief of Police in the course of a television program could endanger the department's ability to perform effectively. Police departments are quasi-military organizations; public safety depends upon good order and discipline. In this case, the Chief's interest in running his department efficiently and in maintaining order and discipline among the ranks outweighed Mr. Kokkinis' limited interest in speaking out in the manner he did.[3]
 
 Conclusion
 
 28
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 AFFIRMED
 
 29
 Diane P. Wood, Circuit Judge, dissenting.
 
 
 
 Notes:
 
 
 [1]
 In January 1995, Mr. Kokkinis had filed two grievances with the department: one for discrimination in the decision not to promote him to detective, and one for discrimination in failure to reimburse him for educational expenses. As of mid-May 1995, Mr. Kokkinis had not received any reply from the Chief regarding his two grievances.
 
 
 [2]
 A transcript of Mr. Kokkinis' entire interview with the reporter is not part of the record.
 
 
 [3]
 In reaching this conclusion, we do not mean to imply, of course, that the reporting of illegal conduct by superiors and, indeed, the airing of grievances in a manner calculated to resolve the problem without jeopardizing the governmental function are never protected. See Cooper v. Smith, 89 F.3d 761, 765 (11th Cir. 1996) ("Clearly, the law does not discourage public employees from cooperating with law enforcement in investigations of unlawful activities within their respective governmental organizations."). Those responsible for matters of local governance regularly provide by such means as statute, regulation, policy, custom, or collective bargaining agreements responsible methods of reporting substantiated allegations of illegal conduct and lapses in good management. See Prager v. LaFaver, No. 98-3116, 1999 WL 390859, at *4-5 (10th Cir. June 15, 1999).
 
 
 
 30
 Diane P. Wood, Circuit Judge, dissenting.
 
 
 31
 Peter Kokkinis appeared on a segment of a television news program devoted to the question whether the Police Department of the Village of Bridgeview had a problem with sex discrimination. The reporter who introduced the disguised Kokkinis to the viewers described him as "another officer who did not want to be identified," and as someone who "feels Officer [Sharon] Walsh is unfairly being chosen for [an] assignment." In the typical, highly-edited style of news broadcasts, the camera shifted to Kokkinis, and viewers heard him make a negative remark about the way in which the Chief of Police administered the Department. Although Kokkinis's history with the Department had not been smooth, matters became worse for him as soon as he was identified as the disguised officer. Kokkinis thought there was a link between his television appearance and the adverse actions taken against him, and he brought this suit under the First Amendment.
 
 
 32
 The majority concludes that the district court correctly threw the case out on summary judgment for two different reasons: first, it accepts the defendants' argument that there is not even a disputed issue of material fact about the question whether the televised statements were on a matter of public concern (i.e. sex discrimination in the Department), based not on the content or context of the program, but instead on their view of Kokkinis's motivation for making the statements he did; and second, it concludes as a matter of law that whatever interest Kokkinis may have had in raising public awareness of sex discrimination within the Department was outweighed by the Department's own interest in maintaining order, discipline, and esprit de corps. In my view, the question whether a speaker has raised a matter of public concern does not turn on the speaker's motivation, even if motivation may help in interpreting the speech. Looking at the overall record, I find disputed issues of fact on both key questions: whether Kokkinis suffered adverse job consequences as a result of his appearance on the television show, and whether the Department can show that its interest in disciplining such an officer outweighed any free speech interest the officer may have had. I therefore respectfully dissent.
 
 
 33
 As the majority explains, in determining whether a public employee's speech is protected by the First Amendment to the U.S. Constitution, a court must consider two questions: (1) whether the speech addresses a matter of public concern, and (2) whether the plaintiff's interest in speaking is outweighed by the state employer's interest in promoting the efficiency of the public services it performs. Waters v. Churchill, 511 U.S. 661, 668 (1994); Button v. Kirby-Brown, 146 F.3d 526, 529 (7th Cir. 1998). The answer to the first question turns on whether the speech relates to a matter of political, social, or other concern to the community, or merely raises a personal grievance of interest only to the employee. Connick v. Myers, 461 U.S. 138, 146 (1983). For purposes of this important threshold inquiry, a court must look at the "content, form, and context of [the contested] statement, as revealed by the record as a whole." Id. at 147-48. Of these three, we have stressed that content is the most important. See Cliff v. Board of Sch. Comm'rs of the City of Indianapolis, 42 F.3d 403, 409 (7th Cir. 1994). While motive has some relevance, particularly in understanding the context of a remark, it is not a litmus test, and it must be considered in relation to the content of the speech itself. Id.; see also Berg v. Hunter, 854 F.2d 238, 242-43 (7th Cir. 1988).
 
 
 34
 The majority does not take issue with the well- established principle that sex discrimination in public employment is a matter of public interest. Slip op. at 6. See Marshall v. Allen, 984 F.2d 787, 795 (7th Cir. 1993); see also Yatvin v. Madison Metro. Sch. Dist., 840 F.2d 412, 419 (7th Cir. 1988) ("Sex discrimination is a matter of public concern; obviously debate over it is protected by the First Amendment."); Callaway v. Hafeman, 832 F.2d 414, 417 (7th Cir. 1987) ("[I]t is undoubtedly true that incidences of sexual harassment in a public school district are inherently matters of public concern . . . ."). It concludes, however, that Kokkinis is not entitled to a trial on his allegations that his comments were about this important public issue, and that his speech gave rise to his problems. It is there that our paths diverge. Material facts are disputed here, most notably the central question of how to interpret Kokkinis's remarks on the fateful news broadcast. Understood one way, perhaps Kokkinis was talking about something entirely extraneous; but understood in another (especially given the overall context of the program), a reasonable finder of fact could also conclude that he was talking about sex discrimination in a way that the Chief found embarrassing. In order to conclude that the undisputed facts support only one outcome, the majority has made Kokkinis's purported motive the dispositive factor, contrary to our own case law and to the more comprehensive analysis that Connick requires. See Zorzi v. County of Putnam, 30 F.3d 885, 896 (7th Cir. 1994); Berg, 854 F.2d at 242.
 
 
 35
 The fact that an employee speaks out in part for personal reasons will not doom her case if other factors indicate that her speech was also intended to call attention to problems of public concern. Button, 146 F.3d at 529; Marshall v. Porter County Plan Comm'n, 32 F.3d 1215, 1219 (7th Cir. 1994); Berg, 854 F.2d at 242. Indeed, we have acknowledged that satisfied employees tend to be less critical of their employers in general, while those inclined to criticize their employers publicly frequently are involved in personal disputes with them as well. Marshall, 32 F.3d at 1219. It is plain on this record that Kokkinis and the Chief of Police were at odds with one another, and, given that animosity, it is probable that the prospect of criticizing the Chief on television appealed to Kokkinis. But the possibility that Kokkinis's motive for speaking was vindictive should not doom his retaliation claim if the objective content of the speech, taken in context, reveals that it was about a matter of public concern (or, more accurately, that a finder of fact could so conclude).
 
 
 36
 The majority has adequately documented the difficulties Kokkinis had experienced within the Department, and I have nothing to add to that discussion. Presenting the facts in the light most favorable to Kokkinis, however, it is also plain that he had decided to become involved in the sex discrimination debate. On May 17, 1995, Cindy Hernandez, a reporter from a local news affiliate, approached Kokkinis to request an interview. Hernandez was preparing a news segment regarding allegations of sex discrimination within the Bridgeview Police Department, and, in particular, reports that Chief Ivkovich had discriminated against one of Kokkinis's fellow officers, Officer Sharon Walsh, because she is a woman. Kokkinis wanted to cooperate, but he was afraid that Chief Ivkovich would retaliate against him for speaking out. He therefore agreed to the interview on the condition that his voice and identity be disguised. He told Hernandez that he believed Walsh was being treated unfairly and he wanted to help her cause. He added that he felt the public should know what was going on inside the Department.
 
 
 37
 Kokkinis's interview was broadcast on that evening's five o'clock news as part of a longer segment focusing on Walsh's allegations. The segment opened with a graphic consisting of a badge, a map of Bridgeview, and the phrase "Sex discrimination?" A reporter introduced the story by explaining that Walsh was the only female police officer in Bridgeview and that she had filed charges against her boss, Chief Ivkovich, alleging discrimination based on her sex. The broadcast then shifted to Hernandez, who was standing outside the Bridgeview Police Department. Hernandez's portion of the report included comments by Walsh's attorney and a video clip showing Walsh with her children. After summarizing Walsh's grievances, which consisted primarily of her complaint that she had been forced to accept an assignment that male officers were routinely permitted to reject, Hernandez introduced Kokkinis. She described him as "another officer who did not want to be identified" and who "feels Walsh is unfairly being chosen for the assignment." Then Kokkinis, his face hidden by dark glasses and a ski mask, appeared, saying: "If they [the public] really knew what was going on, I think they would be shocked, because they are clueless as to what is going on. Everybody is so afraid of the Chief's vindictiveness. If you even dare to question any decision he makes, basically your life will be made miserable."
 
 
 38
 The majority assumes that the only way anyone could understand Kokkinis's remarks is as a generic expression of "his displeasure with the Chief's policies." Slip op. at 7. It then asserts that "Kokkinis' participation in the interview was not designed to address a matter of public concern." Id. While this may be one way to look at the incident, it is not the only way. Indeed, the context points much more strongly to the theory that Kokkinis had decided (for reasons good or bad) to support Walsh's charges. Under cases like Cliff, Berg, and Zorzi, we must not place dispositive weight on Kokkinis's motivations. Especially at this stage of the proceedings, it does not matter if Kokkinis was not particularly concerned about whether Walsh had been a victim of discrimination when he participated in the interview, or if he was simply taking advantage of an opportunity to harm the Chief's reputation. Whatever Kokkinis may have been privately thinking at the time, his statements to Hernandez indisputably were uttered in response to questions about Walsh's allegations. Moreover, the specific statements themselves could be seen as support for Walsh's allegations that the environment in which she worked was a hostile one. Kokkinis's argument does not depend on a finding that he had the "right to say anything that he wanted to about the Chief" because the context was a news broadcast. Id. Instead, he simply points out that the personal gratification he arguably received from the interview did not weaken its link to legitimate matters of public concern.
 
 
 39
 Turning to an alternate ground for decision, the majority also concludes that, even if it were to find that Kokkinis's speech addressed a matter of public concern, it would nonetheless affirm the grant of summary judgment on the ground that the claim cannot survive the Pickering/Connick balancing analysis. See Pickering v. Board of Educ. of Township High Sch. Dist. 205, 391 U.S. 563, 568 (1968); Connick, 461 U.S. at 150-54. Applying the analysis outlined in Caruso v. DeLuca, 81 F.3d 666 (7th Cir. 1996), they find as a matter of law that the potential for Kokkinis's remarks to disrupt and embarrass the Department justified suppressing them. They find particularly persuasive the fact that this dispute arose in a police department, where there is an asserted special need for order, discipline, morale, and obedience to superior officers. See Breuer v. Hart, 909 F.2d 1035, 1042 (7th Cir. 1990); Tyler v. City of Mountain Home, 72 F.3d 568, 570 (8th Cir. 1996).
 
 
 40
 Certainly, a police department where all of the subordinate officers hold their chief in high regard is more desirable in terms of both efficiency and public safety than a department in which officers either openly or secretly question the chief's authority. Nevertheless, this truism should not serve to insulate police departments from scrutiny by the very public they are bound to serve. Many times, the information that is of the greatest public concern is also the most embarrassing for public officials and has the greatest potential to "disrupt" their work. Newspapers regularly run stories about race discrimination, sex discrimination, and corruption within police departments, and it is safe to say that the chiefs of those departments find these stories embarrassing, detrimental to morale, and disruptive to chains of command. But that is the price of free speech, in the final analysis, and the First Amendment is premised on the theory that society is better off in the long run when such matters can be exposed and remedied.
 
 
 41
 Much the same arguments were made in Pickering, where the Court accommodated the conflicting interests at stake with its balancing test. In this court, Breuer is to the same effect. The record in that case revealed a reckless campaign to encourage insubordination and to disrupt the internal operations of a police department. See 909 F.2d at 1041-42. In contrast, the speech for which Kokkinis claims to have been punished relates to charges of discrimination Walsh filed with the Illinois Human Rights Commission, which she pursued actively through appropriate legal channels. In addition, Kokkinis spoke to a reporter, who approached him while he was off duty and not present on department grounds, on a specific matter of public concern. Under the majority's approach, it is difficult to imagine a scenario in which a police officer could feel comfortable speaking to the media about misconduct by members of his department without fear of reprimand, or even termination. Even in the best of circumstances, it is often hard to justify summary judgment when the governing law requires a balancing test; here, I find it impossible.
 
 
 42
 Because I believe a trier of fact could find that Kokkinis's statements related to a matter of public concern, and I cannot find as a matter of law that a threat to the functioning of the department outweighed the interests of Kokkinis and the public in the airing of these views, I respectfully dissent from the court's judgment.