**Louis KUJAWSKI, Plaintiff,**

v.

**BOARD OF COMMISSIONERS OF BARTHOLOMEW COUNTY, INDIANA, State of Indiana, and Bartholomew Community Corrections Department, Defendant.**

**No. IP96–1798–C–B/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 20, 2000.

Richard A Waples, Indianapolis, IN, for plaintiff.

Michael Morow, Stephenson Daly Morow & Kurnik, Indianapolis, IN, for State of Indiana, Bartholomew Cty. Comm. Corrections, defendant.

James S Stephenson, Stephenson Daly Morow & Kurnik, Indianapolis, IN, for Bd. of Com'rs, defendant.

## ENTRY DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FIRST AMENDMENT ISSUE [1]

BARKER, Chief Judge.

Defendants Bartholomew County Board of Commissioners et. al. ("Board") have resubmitted to this Court an issue that was briefed when Defendants moved for summary judgment in October of 1997. Having originally decided the motion on other grounds, we did not reach the issue of whether the October 24, 1994 speech of the plaintiff, Louis Kujawski, (Kujawski) was protected by the First Amendment, or more specifically, whether Kujawski's comments were about a matter of public concern. Now that Kujawski has succeeded on his appeal of our previous decision, the case has been remanded and scheduled for trial. The Board concedes that factual disputes exist as to whether Kujawski was fired because of his speech, but correctly maintains that any dispute regarding causation would be immaterial if we decide, as a matter of law, that Kujawski's speech was not protected by the First Amendment. After reviewing the record and the authorities cited by the parties, we find that Kujawski's speech was entitled to First Amendment protection because it was about a matter of public concern, and has not been shown (or even argued, for that matter) to have interfered with the work of the Community Corrections Department.

### Factual Background–First Amendment Issue

We repeat only the facts in the record pertaining to the speech for which Kujawski claims he was terminated, evidence that we find primarily if not solely in Kujawski's deposition testimony and affidavit. In August of 1994, Mr. Kujawski became a Community Corrections Department (Department) officer in Bartholomew County, where his main duties consisted of supervising offenders who had been sentenced to home detention. (Kujawski Dep. at 29–30). On October 27, 1994, Kujawski attended a farewell party for his supervisor, Mike Richardson, held during normal working hours in the Department office,

---

1. The factual background and procedural history of this case are recounted in *Kujawski v. Board of Comm'rs of Bartholomew County, Ind.,* 183 F.3d 734 (7th Cir.1999). *See also* *Kujawski v. Board of Comm'rs of Bartholomew County, Ind.,* 999 F.Supp. 1234 (S.D.Ind. 1998).

located in the basement of the county courthouse. (*Id.* at 71–72). An invitation passed to "everyone" employed at the courthouse, including the judges, people "connected with probation and correction," and the prosecutor's office, through word of mouth. (*Id.*). With the exception of Richardson's family, no members of the public were present. (*Id.* at 73).

During the party, Kujawski was standing near Sabrina Myers, Director of Community Corrections (who, incidentally, had interviewed Kujawski and hired him for his position), when he heard Myers tell Bartholomew County Superior Court Judge Chris Monroe about the Department's recent arrest of a detainee. (*Id.* at 75–76). Kujawski felt that Myers was "sounding off" about "how great" the Department was, while omitting important details of the arrest about which Judge Monroe should have been advised. (*Id.* at 75–78).

Two of Kujawski's fellow officers, Randy Roberts and J.T. Harrison, who were present at the arrest, had related the details of the incident to Kujawski soon after it had occurred, approximately one week before the party. (*Id.*). Apparently, the Department had received a tip about a firearm located at the home of a detainee. (*Id.* at 79). Victor Parker, the Chief Probation Officer, met with Roberts and Harrison, specifically instructing them on how to handle the situation. (*Id.*). Parker told them "to take pictures of the firearm, write down the serial number, and place the firearm in its original location." (*Id.* at 77). The officers gained entry to the home of the detainee, who was wearing only his underwear, and searched the premises. (*Id.*). They found a handgun in a dresser drawer and, following Parker's instructions, photographed it, recorded its serial number, and replaced it in the dresser. (*Id.*). The officers told the arrestee to get dressed because he was going to jail. (*Id.* at 78). As the arrestee dressed, he reached into the drawer where the gun was located at least two times to remove clothes, giving him access to the gun. (*Id.*).

Roberts and Harrison believed that it was extremely dangerous to allow an arrestee to have access to a weapon during the course of his arrest, and Kujawski agreed. (*Id.* at 80). Kujawski did not know why Roberts and Harrison relayed the story to him; perhaps they wanted to warn Kujawski about a policy that could pose a danger to him as a fellow officer, or perhaps "they thought [Kujawski] could do something about it." (*Id.*).

At his deposition, Kujawski described the following exchange that occurred at the farewell party: Myers said to Judge Monroe, "Did you hear about that young man we took to jail the other day for possession of a firearm?" The judge answered that he had read something about it. (Kujawski explained that the incident was not reported in the newspapers, but was summarized in court documents.) Kujawski then turned to Myers and told her "that she was leaving out the most important part." (*Id.* at 76). Judge Monroe asked, "What part is that?" (*Id.* at 77). Then Kujawski repeated the story as his co-workers had relayed it to him. He offered a critical view that this non-confiscation of weapons policy created a risk to Department officers. When Kujawski had finished this account, Judge Monroe said, "You're kidding me. What idiot came up with that idea?" (*Id.* at 82). The judge immediately told Kujawski, Roberts, and everyone else listening "that the policy was now changing, ... and he outlined it thoroughly as to how a firearm confiscation was to take place from here on out." (*Id.* at 83). The new policy would be that Department officers should immediately confiscate and preferably break down any firearm found on the premises or on an offender, and remove the firearm to an officer's car and secure it in the trunk. (*Id.*). After Judge Monroe's announcement, Kujawski told the judge that he was "delighted" and thanked him. (*Id.* at 85).

All of the ten or twelve other people present heard this exchange. (*Id.* at 85–86). The conversation was loud because

Judge Monroe was standing about 15 or 20 feet away from Kujawski and Myers, at the opposite end of the room. (*Id.* at 76–77). Chief Probation Officer Parker stood nearby and remained silent while Judge Monroe criticized and overruled his weapons confiscation scheme, but Parker "glared at" Kujawski and appeared to be "very angry." (*Id.* at 82). Parker's name was not mentioned during the interchange and Judge Monroe did not know that Parker was the "idiot" who had promulgated the policy; Parker said nothing to defend it. (*Id.* at 82–84).

Kujawski testified that he spoke to Judge Monroe about the weapons issue because he believed that the Department's non-confiscation policy was unsafe, and he believed that the judge had the power to change it. (*Id.* at 78). (Kujawski knew that the judiciary appoints the chief probation officer.) (*Id.*). Kujawski felt that the practice of replacing the weapons of arrestees, instead of confiscating or at least securing or disabling the weapons, could put his and his fellow officers' lives "on the line." (*Id.* at 78, 80). Kujawski calls it a "negligent policy" because it was a verbal directive from Parker, the Chief Probation Officer. (*Id.* at 81–82).

Parker and Myers fired Kujawski on December 2, 1994. Kujawski alleges that his employment was terminated because he exercised his First Amendment rights at the party when he spoke out against the Department's weapons (non) confiscation policy. After his termination, Kujawski submitted commentaries to newspapers criticizing various policies of Parker and other law enforcement agencies, but the first instance of public criticism about the weapons policy was never reported in the papers. (*Id.* at 86).

### Summary Judgment Standard

A motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable jury could find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party may meet its burden of demonstrating the absence of a triable issue by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325, 106 S.Ct. 2548, 2552, 2554, 91 L.Ed.2d 265 (1986). The party opposing a well-supported summary judgment motion may not simply rest on the pleadings, but must respond affirmatively with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In deciding a motion for summary judgment, courts construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir.1999). "Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment." *Butler v. Consolidated Rail Corp.*, 31 F.Supp.2d 1098, 1102 (S.D.Ind.1998) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510).

### First Amendment Issue

■ The issue of whether a public employee's speech is constitutionally protected poses a two-part question of law for the court. *See Kokkinis v. Ivkovich*, 185 F.3d 840, 843–44 (7th Cir.1999). First, we must determine whether the plaintiff's speech addressed a matter of public concern. *Kokkinis*, 185 F.3d 840 at 843 (citing *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983)); *Button v. Kibby–Brown*, 146 F.3d 526, 529 (7th Cir.1998) (same). If so, we then balance the plaintiff's interest in expression against the injury that the expression

could cause to the State's interest, "as an employer, in promoting the efficiency of the public services it performs through its employees."[2] *Button,* 146 F.3d at 529 (quoting *Pickering v. Board of Educ. Of Township High Sch. Dist. 205,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968)); *Kokkinis,* 185 F.3d at 844. "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690.

In deciding whether a plaintiff's speech touches on a matter of public concern, we examine the "content, form, and context" of the speech "as revealed by the whole record," considering content as the most important of the three factors. *Button,* 146 F.3d at 529 (quoting *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690). The motive underlying the statements is a relevant, but not dispositive, factor "in determining whether the speech is of public concern because speech that promotes a purely private interest is not protected." *Id.,* (quoting *Marshall v. Porter County Plan Comm'n,* 32 F.3d 1215, 1219 (7th Cir. 1994)). We ask if the "point" of the speech was to bring wrongdoing to light, or to further a purely private interest. *Id.,* (quoting *Cliff v. Board of Sch. Comm'rs of Indianapolis,* 42 F.3d 403, 410 (7th Cir. 1994)). If the plaintiff acted for personal reasons only or "solely to bolster his own position in a private personnel dispute with his supervisors," rather than "a desire to air the merits of the issue," then his expression is not protected by the First Amendment. *Id.* at 530 (citations omitted).

Speech affecting personal matters is not *per se* outside the scope of the First Amendment, just as all expression involving a situation of some concern to the public is not automatically protected. *Button,* 146 F.3d at 529 (citations omitted). If the speech "addresses only the personal effect upon the employee" of a "subject of public interest," it lacks the element of public concern. *Id.* at 529–30, (quoting *Marshall,* 32 F.3d at 1219). We must decide whether the plaintiff spoke "more like a citizen or a disgruntled employee" when he raised a topic of societal interest. *Id.,* (citation omitted).

### Discussion

■ We find that Kujawski's speech can be fairly considered as relating to a matter of political, social, or other concern to the community; namely, safety of law enforcement officers who oversee detention of criminals on house arrest and, by implication, the safety of the public at-large. Judge Monroe's prompt response in acting to ensure that arrestees would not have access to weapons during arrest demonstrates his recognition of the importance of Kujawski's concerns: protecting officers and innocent bystanders from potential hostage situations, open fire, or any of the myriad disasters that could result when desperate people and guns unite. "As a general matter, speech that addresses questions of public safety and police protection has been recognized as involving matters of vital public concern." *Campbell v. Towse,* 99 F.3d 820, 828 (7th Cir.1996); *see also Auriemma v. Rice,* 910 F.2d 1449, 1460 (7th Cir.1990) ("It would be difficult to find a matter of greater public concern in a large metropolitan area than police protection and public safety.")

Kujawski's desire to be free from bodily jeopardy motivated, in part, his speech at the farewell party, but it is not as though Kujawski's criticism of the policy was incidental to singularly self-interested speech, such as a request for an individual exemption from the policy that would protect only himself. Even if the plaintiff himself

---

**2.** We do not analyze the second prong of the test at this time because the Board offers no argument or evidence on this point; for purposes of the Summary Judgment Motion, we will consider it admitted that the employee's speech interest, if any, out-weighs that of the State as his employer.

had viewed his problem as only a personal matter, "the test of public concern is more objective." *Auriemma*, 910 F.2d at 1460. Beyond the instinct for self-preservation, Kujawski was also moved by concern for the safety of his fellow officers and his belief that Parker's directive constituted a negligent policy. The manner in which Kujawski made his views known, i.e., discussing them with someone outside the Department, a judge, at a quasi-social gathering, bolsters his deposition testimony on that point.

This is not a case where the plaintiff's comments resulted from an intra office squabble. There is no record of animosity between Parker and Kujawski before the events in question. It appears that Kujawski was not trying to "show up" his boss or curry favor with the judge, but rather to do something to expose and correct a serious error in Department protocol. This is evidenced by the fact that Kujawski did not reveal to Judge Monroe that Parker was the one who had thought of the policy. Examining the context of Kujawski's remarks, made at a work-sponsored social function attended by various people employed outside the Department rather than at an official Department meeting, we find additional support for the proposition that Kujawski did not speak as a disgruntled employee motivated by a personal agenda. Kujawski had not raised his concerns about the policy directly with Parker or Myers, nor had he filed a formal grievance.

Seventh Circuit opinions have described the distinction between private and public concern:

> as being the difference between an employee complaining about, matters private to himself, such as whether he was being paid enough or was given deserved promotions, as compared to an employee who is engaged in whistle blowing or otherwise going public with

matters in which the public might be expected to take an interest. *Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1350 (7th Cir. 1995).

In speaking out to express his opinion that the weapons policy was a bad idea, Kujawski acted the same as if he were a civilian who was not employed by the Department (and therefore potentially endangered by the policy).

The Board cites two Seventh Circuit opinions as additional authority in support of its position: *Kokkinis v. Ivkovich*, 185 F.3d 840 (7th Cir.1999) and *Button v. Kibby–Brown*, 146 F.3d 526 (7th Cir.1998) (both quoted above). Although these cases center on unprotected speech of employees in law enforcement settings (police department and prison), we believe they are factually distinguishable from this situation. In *Kokkinis*, a patrol officer appeared anonymously on a television news program covering a female officer's allegations of sexual harassment against the department. 185 F.3d at 842. However, Kokkinis' comments were "not at all related to [the] charge of sex discrimination"; he complained instead about the police Chief's "vindictiveness" in running the department. The Chief learned who made the remarks and suspended Kokkinis. *Id.* The record revealed that Kokkinis had "a limited interest in speaking on the subject of sex discrimination" and, in addition, appeared to have a personal vendetta against the Chief, including keeping a diary to document their disagreements. *Id.* at 844. Similarly, the court in *Button* held that the plaintiff, a prison chaplain who argued he was fired for speaking out about the treatment of an inmate, had in reality been "airing a personal disagreement with a superior's decision" because it adversely affected him. 146 F.3d at 530.

The remaining authorities cited by the Board are not persuasive, nor are they controlling in our Circuit.[3] Topics such as

---

3. One case cited by Defendants, *Settle v. Baltimore County*, 34 F.Supp.2d 969, 995 (D.Md. 1999) held that the plaintiff's speech about racial discrimination within a law enforce-

ment agency "related exclusively to Harris's own particular individual employment concerns," without providing further analysis by which we could compare it to this case.

employee salaries and possible cutbacks (*Tuttle v. Missouri Dep't of Agric.,* 172 F.3d 1025, 1034 (8th Cir.1999)); statements "entirely internal to the . . . police [department]" made "at the request of the Chief" *(Buazard v. Meridith,* 172 F.3d 546, 548–49 (8th Cir.1999)); an internal "shouting match" with one's superior officer (*Vincent v. City of Talladega, Ala.,* 980 F.Supp. 410, 411 (N.D.Ala.1997)); criticism of a prison employee's unsafe working conditions accompanied by requests for a personal body guard in the context of numerous grievances filed with the employer (*Kohl v. Smythe,* 25 F.Supp.2d 1124, 1129 (D.Haw.1998)); and speech clearly intended to protect oneself that is marginally related to misuse of an inmate trust fund (*Knight v. Vernon,* 23 F.Supp.2d 634, 643 (M.D.N.C.1998)) are all distinguishable from Kujawski's speech in October of 1994, which "at the heart" was not overshadowed by his own interest in changing Department policy or any wish to embarrass his superiors. *See Campbell v. Towse,* 99 F.3d 820, 828 (7th Cir.1996).

### Conclusion

For the reasons stated above, the Defendants' Motion for Summary Judgment is DENIED.