**Amy BARKOO, Plaintiff-Appellee,**

v.

**Brian MELBY, individually and in his capacity as Communications Coordinator of the Village of Skokie, et al., Defendants-Appellants.**

**No. 88-3468.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 26, 1989.

Decided May 7, 1990.

As Amended on Denial of Rehearing and Rehearing En Banc July 2, 1990.

Susan P. Malone, Chicago, Ill., for plaintiff-appellee.

Richard T. Ryan, Flynn, Murphy & Ryan, Chicago, Ill., for defendants-appellants.

Before CUMMINGS, COFFEY and MANION, Circuit Judges.

MANION, Circuit Judges.

Amy Barkoo resigned her emergency dispatcher position with the Village of Skokie. She later sued the Village of Skokie and three village employees, ultimately claiming she was constructively discharged in retaliation for exercising her constitutional right to free speech, in violation of 42 U.S.C. § 1983. A jury awarded her $70,000. Because this case is merely an employment dispute and does not involve the deprivation of any constitutional rights, we reverse and remand to the district court and order judgment to be entered for the defendants.

## I. BACKGROUND

From 1981 until 1986 Barkoo was a swing-shift communications operator, commonly referred to as a dispatcher, for the Village of Skokie Fire Department. During those years, she worked one third of the time on the day shift, one third on the evening shift, and one third on the overnight shift (midnight to 8 a.m.). In late 1985 or early 1986 Skokie decided to combine its communications centers for the police and fire departments. Barkoo, who wanted to work the day shift, moved to the Police Department in May 1986 to fill a retirement-created opening on the day shift there. She also hoped to get a head start learning police communications procedures before the fire and police communications centers were combined in September 1986.

Defendant Capt. Albert Fournier, a 25-year police veteran, was in charge of the Police Department communications center from 1985 to 1987. Defendant Nina Reitz, a dispatcher for the Police Department since 1984, became shift supervisor for the combined police-fire dispatch center in October 1986. Defendant Brian Melby became the communications coordinator for Skokie in July 1986.

Barkoo's employment difficulties seem to have begun on Saturday morning, September 13, 1986. Barkoo was working as the police dispatcher. The communications center received a call from a Mrs. Lichtenstein reporting a stolen car. The switchboard operator gave Barkoo a card containing the relevant information. Contrary to the routine practice of Skokie dispatchers, Barkoo did not immediately stamp the card "received," and did not dispatch a police officer until approximately 25 minutes later when the switchboard operator received a second call—this time from an irate Mr. Lichtenstein. Not knowing that Barkoo had failed to dispatch a police officer, the switchboard operator got into an argument with Mr. Lichtenstein. The Police Department received a written complaint from Mrs. Lichtenstein the following week.

The Chief of Police ordered Fournier and Melby to investigate the complaint. They began that investigation by listening to tape recordings of the Saturday morning transmissions into the communications center. They discovered Barkoo's delay in punching the card "received" and dispatching a police officer, despite receiving no other calls in the intervening period. Capt. Fournier testified that the Skokie Police Department usually responded to citizen complaints, absent an unusual circumstance, within three minutes of receiving a report.

While reviewing the tapes, Fournier and Melby discovered they could also overhear conversations between employees in the communications center. They heard Barkoo tell the switchboard operator to put the angry Mr. Lichtenstein on hold, and that he would just have to wait. Barkoo was overheard saying that she sometimes told callers she was a police officer. In a meeting to discuss the incident, Barkoo claims Melby told her "we heard what you said and disciplinary action may follow." Barkoo was upset by her meeting with Melby, and afterward told co-workers about her meeting and about the taping of her office conversation with the switchboard operator. Around the same time Melby wrote a memorandum to the communications center staff explaining that he had just discovered conversations between employees could be overheard. The memorandum, which was posted on the wall of the communications center, indicated that the administration was trying to fix the problem. According to Melby's memo, the ability to overhear employee conversations was a technical glitch created by the communications center's transition to a combination fire and police emergency center.

Fournier and Melby recommended a one-day suspension without pay for Barkoo because of her failure to stamp the card "received" and dispatch an officer for approximately 25 minutes after receiving the call from Mrs. Lichtenstein. Fournier's written recommendation specifically noted that while off-line conversations were overheard, they did not enter into the department's decision on discipline. In addition to the discipline imposed on Barkoo, the switchboard operator received a written reprimand for her role in the incident, which was described as engaging in "rude

and unprofessional" conduct toward Mr. Lichtenstein.

Barkoo appealed to the chiefs of the police and fire departments. They affirmed the suspensions, and Barkoo filed a grievance with the Village of Skokie. Barkoo testified at a grievance hearing that any errors she made in handling calls were attributable to poor training by the Village of Skokie, and asserted that it was apparent she "had to have more training." As a result of the hearing, on January 23, 1987 the Village grievance committee reduced Barkoo's suspension to a written reprimand.

Following her reprimand, Barkoo wrote an interoffice memorandum to various supervisors complaining about the Village of Skokie's consideration of a work plan calling for dispatchers and other employees to occasionally work two consecutive shifts, which Barkoo characterized as "forced overtime." Her memorandum was returned and she was told to follow the proper chain of command. When she resubmitted her memo, it again was returned, this time with a notation from Melby that this was a "non-grievable" item.

A few weeks after receiving her reprimand, Barkoo took a three-day LEADS training seminar as a refresher course. The final day of the seminar was devoted to an exam testing familiarity with LEADS—a computer data system dispatchers used to relay essential information to law enforcement personnel in the field. Barkoo became the first Skokie dispatcher ever to fail the LEADS exam.

On February 26, 1987, Barkoo was told she was being transferred indefinitely to the midnight shift for additional LEADS training. The midnight shift was normally quieter and more conducive to LEADS training. One week later she quit. On June 2, 1987, she filed suit in federal court against the Village of Skokie, Fournier,

Melby and Reitz, alleging among other things that she was harrassed into resigning in retaliation for her exercise of constitutionally protected free speech rights. Her initial complaint stated that Skokie officials retaliated against her because they believed she spoke to the media about the communications center taping. There were two trials. After the close of evidence in the first trial, her complaint was amended to conform to the evidence. The free speech claim in the amended complaint (the claim under which she ultimately recovered) was not founded on any real or perceived discussions with the media. Rather she based her claims on her interoffice memorandum on forced overtime and her discussions with other employees about the communications center taping.

At the first trial, the jury failed to reach a verdict and the judge declared a mistrial. At the second, the judge granted a directed verdict for the Village of Skokie. However, the jury returned a verdict for Barkoo against the individual defendants, and awarded her $70,000. Defendants appeal, challenging the district court's decision to allow Barkoo to amend her complaint, certain evidentiary rulings, and whether her speech activities were constitutionally protected in the workplace context.[1]

Issues from both trials are before us because a mistrial is not an appealable final judgment. *Esneault v. Waterman Steamship Corp.*, 449 F.2d 1296 (5th Cir.1971); *Hairlox Co. v. McDonald*, 557 A.2d 163 (D.C.App.1989); see Wright & Miller, *Federal Practice and Procedure: Civil* § 3915 at 592 (1971). Any errors committed in the first trial could not be appealed until the close of the second trial, when the Rule 58 judgment was entered. Because Barkoo failed to prove a violation of her First Amendment rights at either trial,[2] we

---

**1.** Defendants attempted to raise the affirmative defense of qualified immunity by a passing reference to the issue in their opening brief. Barkoo filed a motion to strike that portion of the brief, which was granted from the bench after defendants formally waived the issue at oral argument. We therefore do not consider the qualified immunity defense.

**2.** Defendants moved for a directed verdict at the close of plaintiff's evidence at the first trial,

arguing at length that Barkoo's speech was not of "public concern." However, the issue was not preserved for appeal because defendants failed to renew their motion within 10 days of the discharge of the jury, pursuant to Fed.R. Civ.P. 50(b). The same motion for directed verdict was made at the same juncture of the second trial, but this time was properly preserved by a timely post-trial motion for judgment notwithstanding the verdict.

hold that the district court should have granted defendants' motion for directed verdict at the close of plaintiff's evidence at the second trial.[3]

## II. ANALYSIS

### A. The Amended Complaint

■ At the close of plaintiff's evidence in the first trial, the district court allowed Barkoo to amend her pleadings to include a cause of action based on the theory that defendants' retaliation was prompted by her discussions with other Village of Skokie employees about the taping of communications center conversations. The defendants contend this was error because they did not receive "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).

Under Rules 15(a) and (b) of the Federal Rules of Civil Procedure, the district court can allow amended pleadings at any point, even after judgment, "when justice so requires," and also to conform to the evidence. Before trial, while the district court judge was summarizing the counts, Barkoo's counsel remarked that the free speech claim included an allegation of retaliation based on discussions with other employees. While defendants' counsel said "I do not think that is alleged," he failed to lodge a formal objection. Nor did he object during trial when Barkoo introduced evidence of conversations with other employees regarding the taping. Defendants made no attempt to "satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits." Rule 15(b). The district court did not abuse its discretion in allowing the pleadings to be amended at the close of plaintiff's evidence.

### B. First Amendment Violation

Barkoo's case is in federal court because she claims her First Amendment rights were violated. She recovered $70,000 in the district court under the theory that defendants retaliated against her because she talked to other employees about the taping of conversations in the communications center and wrote an interoffice memo about "forced overtime." She also contends that retaliation was based on defendants' belief that she instigated newspaper articles related to the communications center tapings.

Defendants argue (as they argued in their motion for directed verdict) that Barkoo's only speech activities were in the context of an employer-employee dispute, and that they were not constitutionally protected in the workplace. Further, defendants contend there is no evidence they retaliated against her because of her speech.

In order to succeed on this constitutional claim, Barkoo must show: (1) that speech she engaged in was constitutionally protected under the circumstances, *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); and (2) that defendants retaliated against her because of that speech. *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). She fails on both counts.

### 1. Protected Speech

■ In *Connick*, the Supreme Court held that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only personal interest ... a federal court is not the appropriate forum to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." 461 U.S. at 147, 103 S.Ct. at 1690. Federal courts must exercise great caution before stepping into employment disputes, and must be convinced an actual constitutional right has been significantly impaired. The Supreme Court has emphasized that the

---

**3.** *See e.g. Schachar v. American Academy of Ophthalmology Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) (holding that antitrust lawsuit, in which a jury after a month-long trial found for the de- fendants, should never have reached the jury, and affirming the district court on the alternative ground that it should have granted defendants' pretrial motion for summary judgment).

unfairness of a particular termination is not a sufficient basis for federal judicial intervention:

> When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable. [Citations omitted].

*Connick,* 461 U.S. at 146, 103 S.Ct. at 1689. As this court put it in *Callaway v. Hafeman,* 832 F.2d 414, 416 (7th Cir.1987), "we will not become entangled in every employment dispute merely because allegations involving free speech arise. The Constitution simply does not guarantee public employment unsullied by the potential for silly and at times unjustified termination or transfers unless premised upon specific forbidden grounds."

*Connick* requires us to scrutinize the "content, form and context" of the speech. 461 U.S. at 147–48, 103 S.Ct. at 1690. Cases since *Connick* have not only focused on the subject matter of the employee's speech, or whether there is any press coverage, but also on the speaker's motivation for engaging in that speech. This circuit "has recently reaffirmed its stance that even though an expression may inherently deal with a matter of public concern, the *Connick* test requires us to look at the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Hesse v. Board of Education,* 848 F.2d 748, 752 (7th Cir.1988), *cert. denied* — U.S. ——, 109 S.Ct. 1128, 103 L.Ed.2d 190 (1989), quoting *Callaway v. Hafeman,* 832 F.2d at 417, and *Linhart*

*v. Glatfelter,* 771 F.2d 1004, 1010 (7th Cir. 1985).

The speaker's motivation and choice of forum are important because, absent those factors, every employment dispute involving a public agency could be considered a matter of public concern. As this court pointed out in *Berg v. Hunter,* 854 F.2d 238, 242 (7th Cir.1988), *cert. denied* — U.S. ——, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989), "[i]f every facet of internal operations within a government agency were of public concern, and therefore any employee complaint or comment on such matters constitutionally protected, no escape from judicial oversight of every governmental activity down to the smallest minutia would be possible." In *Connick,* the Supreme Court distinguished a case in which it held employee speech to be protected, *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), noting that employee speech "not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest. . . . [A]nalysis of whether discussion of office morale and discipline could be matters of public concern is beside the point—it does not answer whether *this* . . . is such speech." 461 U.S. at 149, n. 8, 103 S.Ct. at 1691, n. 8.

■ It is true the inadvertent taping of employee conversations became an issue of some public interest, as evidenced by articles in the local newspaper. But that in itself does not settle the "public concern" inquiry. Not only did Barkoo not communicate with the newspaper, but as we stated in *Egger v. Phillips,* 710 F.2d 292, 317 (7th Cir.1983) (en banc), *cert. denied* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983), "[t]he factors which determine whether a story is newsworthy are hardly coterminous with the factors which determine whether the communication has societal ramifications, and in any event, newspaper editors cannot decide the question for us." While the subject of surreptitious "eavesdropping" of public employees may

be of general concern to the public,[4] Barkoo's private discussion of the taping with other employees is not public speech. To the extent Barkoo alleges that her employers retaliated against her because they *thought* she was engaged in First Amendment protected speech on an issue of public concern, we reject the notion that this allegation brings her claim within the requirements of § 1983. Every § 1983 case relating to workplace freedom of speech, from *Connick* on down, discusses the actual speech engaged in by the employee. Barkoo not only admits, she insists that she did not provide any information to the press. Barkoo provides no authority for the proposition that her free speech rights are deprived in violation of § 1983 when the speech at issue admittedly never occurred. We therefore limit our analysis of Barkoo's speech activities to those that actually occurred—her complaints to other employees about the taping of communications center conversations, and her memoranda relating to the issue of forced overtime.

Barkoo's discussion of the matter with other employees was in the context of her own grievances with the defendants. "This is not a case like *Givhan*, where an employee speaks out as a citizen on a matter of general concern, not tied to a personnel employment dispute, but arranges to do so privately." *Connick*, 461 U.S. 149, n. 8, 103 S.Ct. 1691, n. 8. Barkoo did not need to call a press conference in order to bring her speech under the "public concern" rubric. However, she did need to present some evidence that she publicized the taping out of concern for the public interest. She testified that she did not go to the newspapers with the story. She appears to have been concerned about the taping because she feared it would affect her ongoing grievances with the defendants. She knew they heard her unprofessional com-

ments to the switchboard operator, and feared it would have an impact on her treatment. Her concern was purely personal. "This Court has noted that 'there is a difference between criticism directed at the institution in general and disputes with which the complainant has an intimate personal involvement.'" *Hesse*, 848 F.2d at 752, quoting *Egger*, 710 F.2d at 318.

In *Yatvin v. Madison Metropolitan School Dist.*, 840 F.2d 412, 419–20 (7th Cir.1988), we determined that the filing of a sex discrimination complaint against a school district was not a matter of public concern because the plaintiff "wanted to advance her career, not promote a cause." *Id.* at 419. Barkoo provided no evidence that she was concerned with anything more than advancing her career, or more appropriately here, preventing her career from going downhill. These were legitimate concerns, certainly, but not in any way implicating the First Amendment. Barkoo's own admission that she did not speak to the newspapers while they worked on their stories on the taping further demonstrates that her motivation in speaking was personal.

The speech Barkoo engaged in—telling other employees about the taping of their conversations—is closest factually to the speech at issue in *Altman v. Hurst*, 734 F.2d 1240 (7th Cir.1984), *cert. denied* 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984). Even if we assume Barkoo engaged in that speech for the partial purpose of alerting other employees *so they* would complain, *Altman* indicates that her speech is unprotected. In that case, a police officer allegedly was disciplined in retaliation for encouraging another officer to file a grievance. This court held that the officer's speech was unprotected. "Even assuming ... that plaintiff was disciplined

---

**4.** Barkoo also maintains that her speech is of public interest because various statutes and constitutional provisions contain "strong prohibitions" against eavesdropping. See ILL. CONST. art. I, § 6; Ill.Rev.St. ch. 38, §§ 14–1 *et seq.* This ignores two factors: 1) public employees who are on the clock in an emergency communications center where all phone calls are openly recorded cannot seriously maintain that they

have any reasonable expectation of privacy in their conversations with other employees; and 2) the Illinois statutes relating to eavesdropping provide a specific exception for emergency communications centers. See Ill.Rev.St. ch. 38, § 14–3(d). Further, as discussed above, the subject matter of the speech is not the conclusive factor in determining constitutional protection.

because he encouraged another officer to appeal her suspension ... it does not follow that those comments are protected by the first amendment." 734 F.2d at 1243. After discussing the facts of *Connick*, this court described that case as holding that Connick's firing was not actionable under § 1983 because of the "essentially 'private motive' for the speech.... Similarly, Altman's conduct, to the extent it can be construed as speech, did not involve matters of public interest; rather, it concerned a private personnel dispute." [Citations omitted]. 734 F.2d at 1244.

Barkoo's interoffice memorandum on forced overtime also is not a matter of public concern for purposes of a First Amendment claim in an employment dispute. The issue of forced overtime is another subject that might be "inherently a matter of public concern" in another context, but not here. *Hesse*, 848 F.2d at 752; *Connick*, 461 U.S. at 149, n. 8, 103 S.Ct. at 1691, n. 8. The context in which the memorandum was written was one of increasing hostility between Barkoo and her superiors; discipline for the Lichtenstein incident already had been handed down, grievances had been filed, and Barkoo was in the process of flooding her superiors with complaints, appeals and other memoranda. This was just one of those memoranda, and its subject matter related to the "internal operations within a government agency" that we suggested in *Berg* were not matters of public concern. 854 F.2d at 242.

*Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), which preceded *Connick*, required a balancing test in employee free speech cases between " 'the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State ... in promoting the efficiency of the public services it performs through its employees.' " *Berg*, 854 F.2d at 241, quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. However, "allegations involving free speech [do not] necessitate application of *Pickering's* balancing test where an employee 'speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only private interest....' " *Berg*, 854 F.2d at 241, quoting *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. Because we hold that Barkoo's speech fails the *Connick* "public concern" test, we need not apply the *Pickering* balancing test. Further, as we shall see, *infra*, Barkoo has failed to connect the alleged retaliatory action of the defendants to her speech, which in itself makes the *Pickering* analysis unnecessary.

### 2. Retaliation for Speech

■ Even if Barkoo's memorandum and conversations with other employees were a matter of public concern, the record contains no evidence to suggest defendants' actions were in retaliation for that speech. Barkoo's conversation with other employees about the taping, and her forced overtime memorandum, were two small parts of her ongoing battles with the defendants. The defendants are correct when they point out that Barkoo did not even bother to plead that speech in her initial complaint; even she seems to have recognized that it was not a major contributing factor to any disciplinary actions taken by the defendants. The issue seems to have taken on greater importance because it is the only justification for Barkoo's presence in federal court.

Barkoo claims to have proved retaliation by her own testimony that Melby told her "[w]e heard what you said and disciplinary action may follow." But it wasn't until *after* this meeting that Barkoo spoke with co-workers about the inadvertent taping. If Barkoo's testimony is accurate, Melby was threatening disciplinary action in response to what she said in the communications center on the day of the Lichtenstein incident. Barkoo does not contend that her unprofessional statements to the switchboard operator were matters of public concern protected by the Constitution. There is also nothing in the record to suggest that defendants retaliated against Barkoo because of her forced overtime memorandum.

In contrast to the dearth of evidence suggesting a retaliatory motive for defendants based on Barkoo's speech, every dis-

ciplinary action taken was justified for a number of reasons unrelated to her speech about the tapings or forced overtime. She went through the entire grievance procedure after the Lichtenstein incident, and ultimately received a written reprimand. The only disciplinary action taken against her was unrelated to the overhearing of her conversation with the switchboard operator. She blamed the Lichtenstein incident on her lack of training. She received more training, then failed a crucial exam. She was moved to the overnight shift "indefinitely" because it was most conducive to additional training. She presumably would have been returned to the day shift after receiving that additional training. But she did not wait to find out; she quit and brought this action. Even if the actions of the defendants can be called "retaliation," Barkoo has failed to link those actions to her speech with the other employees about communications center taping, or to her memorandum on forced overtime.

There is no evidence Barkoo was motivated to speak to other employees about the taping or write the forced overtime memorandum by any concern for the public interest, or by anything other than self-interest in her own disputes with the defendants. Her speech was not of sufficient "public concern" to warrant first amendment protection in the context of a municipality's employment dispute. Further, there is no evidence linking the perceived "retaliation" to her speech. Barkoo cannot maintain this action in federal court.[5]

## III. CONCLUSION

If there is any merit in Amy Barkoo's claim that she was retaliatorily discharged, that claim belongs in state court. Her speech involved private grievances with her superiors, and she has failed to show that defendants' actions were prompted by that speech. No federal constitutional rights

were implicated. For the foregoing reasons, the judgment of the district court is

REVERSED.

---

**5.** The defendants also challenge the district court's decision to allow evidence in the form of newspaper articles about the "eavesdropping" issue, and memoranda written by Barkoo to her superiors. They contend that Barkoo did not prove she was "constructively discharged," and

they challenge other evidentiary rulings. Because our holding on the free speech issue disposes of Barkoo's claim and mandates reversal, we need not express our opinion on the merits of defendants' other claims.