McKEAGUE, Circuit Judge,
concurring in part and dissenting in part.
I agree with the majority that the district court appropriately granted summary judgment on Erskine’s, Hall’s, and Perttunen’s protected speech claims, and as to the bulk of plaintiffs’ political-affiliation claims. But the majority also concludes that an individual’s perceived affiliation with a political party can form the basis of a First Amendment retaliation claim, and that in this case, all four plaintiffs have established questions of fact as to whether them perceived affiliation with the Republican Party motivated defendants’ decision to take away their banked-days. The majority further concludes that there are material questions of fact with respect to plaintiff Dye’s First Amendment protected speech claim. Because the majority’s conclusion that an individual’s perceived political affiliation should receive First Amendment protection is not supported by political affiliation case law, and because Dye’s protected speech claim hangs entirely on a very thin temporal thread, I respectfully dissent.
I.
A plaintiff-employee seeking to establish a prima facie case of retaliation under the First Amendment must point to evidence sufficient to establish three elements: 1) the plaintiff engaged in a constitutionally protected activity; 2) an adverse action was taken against the plaintiff that caused him or her to suffer an injury that would deter a person of ordinary firmness from continuing to engage in the conduct; and 3) the adverse action was motivated at least in part by the plaintiffs protected activity. This standard applies in both protected speech retaliation claims and in political affiliation retaliation claims not brought under the political patronage dismissal doctrine. Eckerman v. Tenn. Dep’t of Safety, 636 F.3d 202, 207 (6th Cir.2010) (finding protected conduct for purposes of a political affiliation claim where plaintiff *310 publicly supported Republican candidates with signs, bumper stickers, attendance at rallies and monetary donations).
If the plaintiff succeeds in establishing these three elements, then the defendant must show that he would have made the same decision in the absence of the protected conduct. Id. at 208. Summary judgment is warranted if, “in light of the evidence ... no reasonable juror could fail to return a verdict for the defendant.” Id. If the defendant meets his or her burden, that is the end of the inquiry, and the burden does not then shift back to the plaintiff to prove pretext. Helwig v. Pennington, 30 Fed.Appx. 516, 519 (6th Cir. 2002).
We have recognized that under the Supreme Court’s political patronage cases, “[t]he right of political association is well established as falling within the core of activities protected by the First Amendment.” See Sowards v. Loudon County, 203 F.3d 426, 432 (6th Cir.2000) (concluding there was protected political affiliation activity supporting a First Amendment retaliation claim where plaintiff was supporting her husband’s campaign for office). We have also recognized that “[sjupport of a political candidate falls within the scope of the right of political association.” Id. (citing Elrod v. Burns, 427 U.S. 347, 356-57, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)).
Applying these standards here, plaintiffs Dye and Hall can likely satisfy the first prong of the prima facie test in that each of them engaged in conduct from which defendants could conclude they were affiliated with the Republican Party (Dye by speaking directly to defendants about his affinity for the Republican candidate and Hall by campaigning for the Republican candidate at the racetrack). This conclusion is based on the fact that they engaged in constitutionally protected conduct by speaking out about their particular political leanings.
By contrast, neither plaintiff Erskine nor Pertunnen engaged in any such conduct. In fact, they expressly denied that they did.[1] Yet the majority concludes that defendants’ alleged perception that Erskine and Pertunnen were affiliated with the Republican Party is enough to satisfy plaintiffs’ burden of establishing that they engaged in protected activity. Because the Supreme Court has not spoken directly on this issue, and because the case law is ambiguous with respect to whether such a claim is cognizable, we should not expand the scope of First Amendment protections to this as yet unrecognized context.
*311 The Supreme Court’s political affiliation cases, relied on by this Court in First Amendment retaliation cases like Eckerman and Sowers, are silent on whether perceived political affiliation, without more, is protected First Amendment activity. As described by the Elrod plurality, the unacceptable behavior these cases sought to rectify was the restraint patronage practices place on freedoms of belief and association. 427 U.S. at 355, 96 S.Ct. 2673. Accordingly, all of the cases involved some type of coercive requirement that employees affiliate with a particular political party in order to avoid an adverse employment action. See Elrod, 427 U.S. at 355, 96 S.Ct. 2673 (“In order to maintain then-jobs, respondents were required to pledge their political allegiance to the Democratic Party, work for the election of other candidates of the Democratic Party, contribute a portion of their wages to the Party, or obtain the sponsorship of a member of the party, usually at the price of one of the first three alternatives.”); Branti v. Finkel, 445 U.S. 507, 509, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) (“With one possible exception, the nine [individuals] who were to be appointed or retained were all Democrats and were all selected by Democratic legislators or Democratic town chairmen on a basis that had been determined by the Democratic caucus. The District Court found that Finkel and Tabakman had been selected for termination solely because they were Republicans and thus did not have the necessary Democratic sponsors[.]”); Rutan v. Republican Party of Illinois, 497 U.S. 62, 66, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (“In reviewing an agency’s request that a particular applicant be approved for a particular position, the Governor’s Office has looked at whether the applicant voted in Republican primaries in past election years, whether the applicant has provided financial or other support to the Republican Party and its candidates, whether the applicant has promised to join and work for the Republican Party in the future, and whether the applicant has the support of the Republican Party officials at state or local levels.”).[2]
Two circuit courts have relied on these patronage cases as a basis for concluding that government employers cannot take adverse employment actions against politically unaffiliated employees solely because the employees were politically unaffiliated or perceived as being unaffiliated with the party in power. See Welch v. Ciampa, 542 F.3d 927 (1st Cir.2008); Gann v. Cline, 519 F.3d 1090, 1094 (10th Cir.2008). The majority here relies on Welch and Gann to argue that in this case defendants’ mere perception of plaintiffs Erskine and Pertunnen as Republican is enough to satisfy the protected activity prong of the prima facie test.
By contrast, in Ambrose v. Twp. of Robinson, Pa., 303 F.3d 488, 495 (3d Cir.2002), the Third Circuit clearly rejected what it termed a “perceived support” theory. In that case, officials discussed the plaintiffs alleged actions in stealing files to support a colleague who had filed a lawsuit against the employer. The plaintiff in part alleged that adverse action was taken against him because the employer believed he was supporting the colleague even though the plaintiff did no such thing and even denied *312 that he did. The court rejected this “perceived support” theory arguing “[pjlaintiffs in First Amendment retaliation cases can sustain their burden of proof only if their conduct was constitutionally protected, and, therefore, only if there actually was conduct.” Id. (citing Fogarty v. Boles, 121 F.3d 886, 890 (3d Cir.1997) (emphasis added)).
In justifying its conclusion, the court relied primarily on several protected speech cases. See, e.g., Fogarty, 121 F.3d at 890 (holding that principal’s mistaken belief that teacher had engaged in protected conduct, when teacher had not engaged in any conduct at all, could not support First Amendment retaliation claim); Was-son v. Sonoma Cnty. Junior Coll., 203 F.3d 659, 663 (9th Cir.2000) (“[Tjhere can be no First Amendment cause of action where there was no speech by the plaintiff.” “[A] plaintiff must demonstrate that she has engaged in constitutionally protected expression to establish a First Amendment retaliation claim.”); Jones v. Collins, 132 F.3d 1048, 1050-51 (5th Cir. 1998) (no protected conduct where school principal was alleged to have leaked information and was transferred as a result, but never really leaked the information and denied doing so); Barkoo v. Melby, 901 F.2d 613 (7th Cir.1990) (concluding there was no protected conduct where plaintiff claimed her employer retaliated against her based on the mistaken belief that plaintiff was providing information to the press about her employer’s inadvertent eavesdropping).
The Ambrose court also noted that a protected speech case from the Supreme Court, Waters v. Churchill, 511 U.S. 661, 679, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), supported its conclusion because in that case the Court stated: “We have never held that it is a violation of the Constitution for a government employer to discharge an employee based on substantively incorrect information.” Ambrose, 303 F.3d at 495 (quoting Waters, 511 U.S. at 679, 114 S.Ct. 1878).
Like the Third Circuit, the majority here also relies on Waters, albeit to reach the opposite conclusion. The majority asserts that Waters establishes that whether there was protected speech or conduct (the Connick test that is applied in protected speech cases) should depend on what the government reasonably thought was said rather than what, if anything, was actually said. Extending this proposition to the political affiliation context, the majority claims we should consider what defendants reasonably believed to be true about plaintiffs’ affiliation with the Republican Party — even if the evidence does not include conduct establishing the existence of such an affiliation. But the majority’s reading of Waters does not comport with that decision’s underlying rationale, nor does the majority explain why a protected speech case (Waters) should govern the outcome in this political affiliation case.
In Waters, a nurse was fired by her government employer based on what the employer thought she said to some other nurses about regulatory violations and the poor quality of nursing care in the hospital. The employer conducted a thorough investigation into the alleged speech and concluded it was true. The discharged nurse admitted speaking on hospital policy matters, but denied making some of the statements attributed to her. After her termination and grievances, she filed a § 1983 action claiming her termination violated her First Amendment rights.
The Supreme Court plurality explained: [Constitutional review of government employment decisions must rest on different principles than review of speech restraints imposed by the government as sovereign. The restrictions discussed *313 above are allowed not just because the speech interferes with the government’s operation ... Rather, the extra power the government has in this area comes from the nature of the government’s mission as employer.
* * * * *
The key to First Amendment analysis of government employment decisions, then, is this: The government’s interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.
Waters, 511 U.S. at 674-75, 114 S.Ct. 1878.
Accordingly, the plurality concluded that a requirement that only the employee’s actual speech can be considered in an employment decision was too rigid a test to satisfy the government’s interest in efficient employment decisionmaking. Id. at 675, 114 S.Ct. 1878. Thus, government employers should be given some leeway in deciding how to weigh differing versions of a conversation, who to credit, and how personal knowledge should play a role in the ultimate decision, even if the risk in these procedures was that the employer may erroneously punish protected speech. Id. at 676,114 S.Ct. 1878.
The deliberate effect of Waters is to give more deference to government employers’ employment decisions. In stark contrast, the majority’s application of Waters in this case makes it more difficult for the government to make employment decisions — including rudimentary changes in employment practices such as offering comp time. Yet, the majority here proposes extending Waters in just this way. The majority claims that what defendants reasonably believed about plaintiffs’ affiliation with the Republican Party — even if untrue— satisfies the protected activity element. On this basis the majority concludes that plaintiffs here engaged in protected conduct and that defendants’ decision to take away the banked time system was motivated by that perceived conduct.[3]
The majority’s reading of Waters is troubling for two reasons. First, by allowing a perceived affiliation claim such as the one here to go forward, the Court is essentially providing more First Amendment protection to government employees — specifically, the Court is extending First Amendment protection to government employees who have not even engaged in any actual conduct or speech. That result seems to be totally inconsistent with the Waters plurality’s main justification that we should be giving deference to government employer’s efficiency concerns in employment decision making.
Second, the majority does not explain why Waters, a protected speech case, should apply with equal force to a political *314 affiliation case such as this one. In my view, even though this is not a political patronage case, any decision on the perceived affiliation issue should certainly take into account the governing principles in the Supreme Court’s political patronage dismissal cases, Elrod, Branti, and Rutan (rather than protected speech cases such as Waters). Those cases deal directly with First .Amendment protection of the right to political affiliation, and are thus a window into how the Court views such claims. We have previously used the political patronage cases to inform our decisions on whether plaintiffs engaged in protected affiliation activity for purposes of a retaliation claim. See Sowards, 203 F.3d at 432; Eckerman, 636 F.3d at 208. In the patronage cases, the Court was not concerned about whether a category of speech was protected, but rather it was troubled by “the restraint ... on freedoms of belief and association”- — -an issue that hews much more closely to the facts in this case. 427 U.S. at 355, 96 S.Ct. 2673. In all of those cases, there were affirmative restraints placed on the employee’s ability to affiliate or remain unaffiliated, such as requiring a portion of wages to be given to a particular political party or requiring sponsorship from a party member.
Here, by contrast, defendants did not require plaintiffs Erskine and Pertunnen to pledge support for a party or seek a party sponsor. Nor did defendants know, based on Erskine’s and Pertunnen’s conduct, that they were affiliated with the Republican Party. In fact, Erskine and Pertunnen denied engaging in any conduct that would have shown their affiliation with the party.[4]
In sum, the Supreme Court has not spoken on the precise issue here — whether an employer’s mere perception of an employee’s affiliation is sufficient to establish that the employee engaged in protected First Amendment activity. By permitting this type of claim, the majority extends First Amendment protections to a context not previously recognized. The majority’s conclusion also seems contrary to the Supreme Court’s rationale for addressing First Amendment claims involving government employers. Absent controlling law on this issue, I cannot conclude that plaintiffs Erskine and Pertunnen have satisfied their- burden of showing they engaged in protected First Amendment activity.
Moreover, in my view, it was unnecessary for us to even decide this issue because none of the plaintiffs can satisfy the additional elements of a prima facie retaliation claim.
II.
A. Dye’s Protected Speech Claim
The majority concludes that the temporal proximity between Dye’s speech and his demotion satisfies the causal-connection element of his First Amendment Claim. The majority grounds this conclusion on flimsy evidence that Dye’s speech and his demotion actually occurred within two months of each other.
It is true that sometime between October 11, 2006 and November 8, 2006, defendant Post informed Dye that his position was being eliminated. From this, the majority concludes that Dye’s political speech with Post happened “[a]t the very earliest ... on some date in September 2006.” The majority also acknowledges that there is no specific date in the record, but argues that because Dye was told about his demotion before November 8, 2006, the notice “must have occurred within two months, if *315 not sooner, of the protected activity.”[5]
The majority relies on a Title VII decision from this Circuit that concluded the causation element of a prima facie case was met based on temporal proximity alone where three months had lapsed. See Ante (citing Singfield v. Akron Metro. Housing Auth., 389 F.3d 555, 563 (6th Cir.2004)). But this conclusion conflicts with a more recent decision of this Court. See Arendale v. City of Memphis, 519 F.3d 587, 606 (2008) (affirming summary judgment for defendant and rejecting plaintiffs argument that retaliatory events occurring two months after an EEOC charge of discrimination were alone sufficient to establish temporal causal connection).
Even assuming the gap here was within two to three months, the majority also concedes that temporal proximity alone has its limitations and that “where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.” See Ante (citing Mickey v. Zeidler Tool & Die Co., 516 F.3d 516 (6th Cir.2008)); see also, Arendale, 519 F.3d at 606 (“Plaintiff claims that the fact that the retaliatory events occurred just two months after the EEOC charge of discrimination is enough by itself to support the causal connection element. This is simply a misstatement of the law. Absent other evidence of retaliation, Plaintiffs retaliation claim must fail”).
Given that the evidence is unclear as to precisely when Dye and Post talked politics and when Post informed Dye his position was being eliminated, and that in any event it is likely the gap in time is at the outside limits of what this Court has determined is acceptable, Dye should have been required to bring some other evidence of retaliatory conduct in order to establish the elimination of his position was based on his protected speech. But neither Dye nor the majority point to any other evidence, specifically as it pertains to the elimination of Dye’s position. In this case, temporal proximity alone is not sufficient for Dye to establish causation. This conclusion is even more clear when considering defendants’ proffered reasons for eliminating Dye’s position.
The majority discusses that defendants’ eliminated Dye’s position for budgetary reasons and that certain of Dye’s functions were being reassigned to Post. Yet, the majority ultimately determines that defendants’ evidence is not sufficient to conclude that no reasonable juror could fail to return a verdict for defendants. But the majority’s discussion of the evidence in this case is incomplete.
The opinion neglects to mention that Dye knew as early as June or July of 2006 that his job responsibilities were being diminished. This was several months before he engaged in any protected activity. Dye’s reduced responsibilities (and the eventual elimination of his position) is completely consistent with defendants’ claims that budgetary concerns required examination of how staff were being used and that there was not enough work to justify the continued cost of the position.[6] (Post. Aff. *316 ¶ 8, Page ID #297-98). This in turn is consistent with the precipitous decline in race dates and revenues during this time period, (Post Aff., Exhibit 3, Page ID # 307), culminating in drastic budget cuts in 2007, 2008, and 2009. (Post Aff. ¶ 14-15, Page ID # 302).
The fact that Dye’s position was eliminated because of budget issues is also supported by Post’s decision to add Dye’s job responsibilities to his own, and that defendants did not hire someone new to fill Dye’s Administrative Liaison role. (Dye Dep., Page ID # 318).
This evidence belies the majority’s conclusion that Dye established causation here simply by asserting an imprecise and attenuated connection between his political speech and the elimination of his position. Instead, when contrasted with Dye’s feeble causal nexus, this evidence compels the conclusion that no reasonable juror could fail to return a verdict for defendants.
B. Dye and Hall’s Affiliation Claims
For the reasons discussed above, in my view, only Plaintiffs Dye and Hall may be able to satisfy the protected activity element of their political affiliation claim on the basis that their conduct may be enough to establish that defendants believed Dye and Hall were affiliated with a political party.[7] See Sowards, 203 F.3d at 432 (“Support of a political candidate falls within the scope of the right of political association.”). That said, Dye and Hall would also still have to establish that elimination of the banked time system was an adverse action and that defendants took that action at least in part because of Dye and Hall’s affiliation with the Republican party.
The district court concluded elimination of the banked time system was not an adverse employment action because plaintiffs would still continue to be paid for each work day. The majority comes to the opposite conclusion.
In Adair v. Charter Cnty. of Wayne, 452 F.3d 482 (6th Cir.2006), this Court addressed the argument that a freeze on the use of banked time was an adverse employment action for purposes of a retaliation claim under the Fair Labor Standards Act. We held that the freeze on banked time was not an adverse action because it “did not result in a material loss of benefits, termination, demotion, transfer, or alteration of job responsibilities.” Id. at 490. Rather, defendants merely required plaintiffs to use vacation days for vacation rather than save it for pay at a later date. Id.
The majority here asserts that Adair is only of limited instructional value because of the “distinct standard” applied to First Amendment retaliation claims where the question is whether the alleged action would “deter a person of ordinary firmness from exercising the right at stake.” Thaddeus-X v. Blatter, 175 F.3d 378 (6th Cir. 1999) (en banc). Applying this standard, the majority concludes that here the banked time program “was a key benefit to these stewards,” and “[although White and Post changed the structure of the compensation in a way that would not inflict any potential monetary losses, it certainly imposed a different type of financial burden on the stewards. The lack of a steady income, especially when combined with the decrease in racing days, could certainly chill or silence a person of ordinary firmness.”
This conclusion is not warranted by how the banked time system actually worked. *317 The system allowed the Harness Stewards to essentially “bank” days they worked over the regular ten days in any 14 day period. Thus, if a steward worked 11 days in two weeks, that steward could put one day in the “bank” to use at a later time, for example to fill in for missed days in a later pay period if he or she took time off. When defendants eliminated the banked time program, they still allowed plaintiffs to use any accumulated time until it ran out, and plaintiffs would still be paid for any days worked over their ten regular days, but they simply could no longer bank those days for later use. The fact that plaintiffs still get paid for any days worked over ten days cuts against the majority’s conclusion that elimination of the banked time system resulted in a “lack of a steady income,” which “when combined with the decrease in racing days, could certainly chill or silence a person of ordinary firmness.”
Even after the system was eliminated, plaintiffs were still permitted to use time they had banked until it ran out. Additionally, plaintiffs could still work additional days over the regular ten and get paid for it. The only real difference is that plaintiffs would be personally responsible for saving the money from that extra day of work instead of having the state hold onto it for them. In other words, rather than having the state “bank” plaintiffs’ rainy day funds, plaintiffs themselves would be required to deposit the money into a savings account or put it into an envelope and use it when they needed it.
Plaintiffs’ complaints regarding elimination of the banked-time system amount to nothing more than purely personal reasons for preferring a former state of affairs over the current state of affairs, which this Court has stated in the Title VII context does not constitute an adverse action. See Strouss v. Michigan Dept, of Corrections, 250 F.3d 336, 343 n. 2 (6th Cir.2001); see also Smith v. Cnty. of Hamilton, 34 Fed. Appx. 450, 456 (6th Cir.2002) (concluding loss of opportunity for compensatory time was not adverse employment action under Title VII). Essentially, as contract employees, the only thing plaintiffs here lost was the state’s willingness to hold onto their extra pay when they wanted to take a day off or when there was no work. Now they would be responsible for that. This hardly seems to be the type of loss that would deter a person of ordinary firmness from affiliating with a political party.
Moreover, even assuming the loss of banked time was an adverse action, Dye and Hall would still have to show the system was eliminated because of their political affiliation and that defendants’ stated reasons for eliminating the system do not support the conclusion that no reasonable juror could fail to return a verdict for defendants.
Dye and Hall’s best evidence of causation are defendants’ alleged statements that they were eliminating banked time because of plaintiffs’ support for the Republican candidate in the previous gubernatorial election. Even though these statements go to the causation element, when considered alongside evidence that defendants did not just eliminate the banked time system for plaintiffs but they also eliminated it for two other Harness Stewards who were not a part of this lawsuit, the causal connection is not so clear. Additionally, defendant White denied ever making a statement that she eliminated the banked time system because of plaintiffs’ political affiliations. Even though at the summary judgment stage we view the evidence in the light most favorable to the nonmoving party, this other evidence at the very least creates some doubt about plaintiffs’ claim that defendants eliminated the banked time *318 system because of plaintiffs’ Republican affiliations.
This conclusion is even more questionable when defendants’ reasons for eliminating the banked time system are considered. White testified that she consulted with the Department of Agriculture’s Human Resource Director “soon after [White] learned of the banked days,” and that the Director informed her that the banking system was a liability for the Agency. The Director told White that because plaintiffs were contract employees and not entitled to sick leave or annual leave, they should not be getting banked days to use for that purpose. White relied on this advice when she decided to end the practice, and because she had consulted with the Director, she did not consider her decision to be discretionary.
Defendant Post’s testimony corroborates White’s assertions. He testified that he and White were concerned about the lack of oversight and accountability with the “banking” process, and that after consulting the Department of Agriculture’s Human Resource Director, the decision was made to eliminate it because it was not governed by any written policy or Civil Service rules, it was not used by any other types of racing stewards, and there was no management or oversight of the process.
Plaintiffs allege that at the January 2007 meeting, White said the banked time was being eliminated because of plaintiffs’ perceived affiliation. But when that alleged statement is stacked up next to evidence that the system was eliminated for all of the Harness stewards not just plaintiffs, that White testified she did not make those statements at the January meeting, that White and Post were concerned about the lack of oversight and thus consulted with the Director of the Department who told them the practice should cease, and that White did not consider her decision to be discretionary, it seems clear that no reasonable juror could fail to return a verdict for defendants with respect to whether their decision was politically motivated.
III.
For the foregoing reasons, I disagree with the majority’s conclusions on these issues and would therefore affirm the district court’s decision to grant defendants’ summary judgment motion.

. Pertunnen testified:
Q: Did you support Dick DeVos?
A: No.
Q: Did you make a campaign contribution to Dick DeVos?
A: No.
Q: Did you have a bumper sticker for Dick DeVos on your car?
A: No.
(Pertunnen Dep., Page ID # 373).
Similarly Erskine testified:
Q: Did you ever tell Mr. Post that you did not support Jennifer Granholm but that you supported Dick DeVos?
A: No.
Q: Did you ever tell Commissioner White that you supported Dick DeVos and not Jennifer Granholm?
A: No. She just assumed that.
Q: How do you know she assumed that?
A: Because of what she said in a meeting we had.
Q: So I understand, though, you at no time ever told her your political views or who you supported for the gubernatorial office?
A: No.
Q: And the same thing with respect to Gary Post?
A: Correct.
(Erskine Dep., Page ID # 461).

. The patronage cases also recognize that the First Amendment protects employees who elect not to affiliate with any party. See Rutan, 497 U.S. at 76, 110 S.Ct. 2729 ("The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate.”). None of the plaintiffs in this case have claimed defendants were interfering with their right not to affiliate.

. The majority relies on Dambrot v. Cent. Mich. Univ., 55 F.3d 1177, 1189 n. 9 (6th Cir. 1995) as the authority for this Court’s interpretation of Waters. But in that case, in contrast to the majority’s conclusion, the Court's decision comported with the Waters’ rationale of giving deference to employment decisionmaking. There, a basketball coach used the N-word with his players. He claimed it was a motivational tool. In addressing that argument, this Court stated, “[wjhat the First Amendment does not do, however, is require the government as employer or the university as educator to accept this view as a valid means of motivating players.” Dambrot, 55 F.3d at 1190. Thus, the majority's reliance on Dambrot as an interpretation of Waters to be applied to the facts here is misplaced.

. See supra, note 1.

. At oral argument, the state conceded the discussion happened prior to the election, but could not state precisely when it occurred.

. The majority also fails to wrestle with Dye’s own testimony on what the costs of his position were, including discrepancies regarding Dye’s salary, the fact that Dye had a state car, a gas card, a state-issued phone, and that the state paid his expenses for overnight stays and meals. (Arg. Audio at 23:20; Dye Dep., Page ID #316).

. Even if Erskine and Pertunnen could satisfy the protected activity requirement, as the subsequent analysis shows, their claims would fail on the other elements.